THE CINCINNATUS ASSOCIATION, APPELLEE, *v.* CINCINNATUS PARTY ET AL., APPELLANTS.

(No. C-800123—Decided June 10, 1981.)

*Messrs. Frost & Jacobs, Mr. James R. Adams* and *Mr. James P. Karen,* for appellee.

*Condit & Dressing Co., L.P.A.,* and *Mr. James J. Condit,* for appellants.

KEEFE, J. On June 13, 1979, The Cincinnatus *Association* (hereinafter generally only Cincinnatus Association) brought an action against the Cincinnatus *Party,* a political committee, and certain other defendants who were or allegedly intended to be candidates in the Cincinnati councilmanic election scheduled to take place in November 1979. In addition, one of the defendants seems to have been a public relations consultant. Because of the issues which this litigation raises, there is no reason to identify each of the defendants with additional specificity. Generally we shall collectively refer to all defendants as the Cincinnatus Party.

The following two paragraphs of the Cincinnatus Association's prayer for relief provide an elucidative account of what this matter is all about. The prayer in pertinent part asks:

"A. That defendants * * * be preliminarily and permanently enjoined from using or displaying, directly or indirectly, the name Cincinnatus, or any name so similar thereto as to be likely to cause confusion, mistake or deception, or constituting a counterfeit, copy or imitation, and intentional wrongful use and palming off of the name Cincinnatus, causing the likelihood of confusion, or misunderstanding as to the source, sponsorship, approval or certification of defendants' activities, or cause misunderstanding as to affiliation, connection and association of defendants with plaintiff or certification of defendants by plaintiff, in connection with publicity relating to defendants' intended use of said name;

"B. That defendants be preliminarily and permanently enjoined from using or displaying, directly or indirectly, the name Cincinnatus in its name, association name, and political committees or party * * *."

According to its complaint Cincinnatus Association is an approximately sixty-year-old unincorporated non-profit association engaged in civic, cultural, educational and political activities principally in the metropolitan Cincinnati, Ohio area. Throughout its history, the Association has been identified with impartial investigation of issues, dissemination of fact sheets, research data and booklets on those issues, and recommended positions on such issues. Its resolutions, fact sheets and lobbying efforts have been given wide public dissemination

in the news media, radio and television, according to the complaint. We discover nothing in the record which contradicts the plaintiff association's evaluation of its civic nature; we find nothing contradicting its civic usefulness.

The Cincinnatus Party denies it adopted that name to trade on the prominence and community acceptance of the plaintiff association — to whatever extent these exist. The Party opposed granting any injunctive relief to the Association, claiming in short, that plaintiff has not proven that it is entitled to the use of the word "Cincinnatus" to the exclusion of the Party, arguing in part that the Association has not had exclusive use of the name "Cincinnatus" even from the beginning of its existence in 1920.

We reiterate that the petition was filed June 13, 1979. On June 14 a hearing was held and a temporary restraining order against the Cincinnatus Party issued that same day. Several agreed extensions of the temporary restraining order followed until the court below — on February 20, 1980 — issued a permanent injunction against the Party and the other defendants, enjoining them from using the name "Cincinnatus" and prohibiting them from the use of any similar name in any manner suggesting sponsorship of defendants' activities by plaintiff Association; and in addition enjoining defendants from using the name "Cincinnatus" in connection with a political party or activities related to a political campaign engaged in by defendants. This appeal ensued.

First and foremost, the right of the Cincinnatus Association to the injunctive relief sought in this matter must be shown by evidence which is clear and convincing.

*Southern Ohio Bank* v. *Savings Assn.* (1976), 51 Ohio App. 2d 67 [5 O.O.3d 183].[1]

The single assignment of error challenges the judgment below, that is the permanent injunction, as being against the weight of the evidence.

The error assignment is meritorious. We of course do not have to decide whether the weight of the evidence even satisfies a "preponderance" test and we make no such decision; however, the evidence definitely fails to satisfy the "clear and convincing" standard required for a favorable judgment.

The trial judge authored a brief letter opinion and included it in the judgment entry. The following paragraphs from the opinion are the essence of the rationale for the judgment below:

"[I] The Court finds from the evidence that Plaintiff Cincinnatus Association is a civic organization, engaged in political, semi-political and civic activities, and is known in the community and throughout the State for its interests and engagement in such activities since its inception in 1921. This fact thus gives the name Cincinnatus Association its secondary meaning as a promoter of political activities as well as its other pursuits. * * *

"[II] The Court further finds from the evidence, not only is there 'likelihood of confusion,' but that there has been actual confusion.

"[III] The Court having previously found that Plaintiff Cincinnatus Association used its name since 1921, while Defendant Cincinnatus Party used its name since 1979, Plaintiff's use of the name was prior in time and therefore preemptive."[2]

---

[1] In *Household Finance Corp.* v. *Altenberg* (1966), 5 Ohio St. 2d 190, 193 [34 O.O.2d 348], it is stated that: "The term, 'clear and convincing,' has a well defined meaning with the bench and bar. It indicates a degree of evidence required in a special type of civil case that is less than the degree required in a criminal case but more than that required in an ordinary civil action."

[2] The roman numeral prefixes have been supplied by the author of this opinion; they do not appear in the trial court's letter opinion.

All the Association's testimonial evidence about the history of the organization, including opinions about possible confusion between the Association and the Party, came from members of the Association except one witness, Joseph H. Head, Jr., attorney, who gave his address as 8855 Camargo Club Drive, Cincinnati, Ohio. The testimony of these witnesses referred to the "secondary meaning" of the Cincinnatus Association and how it affected the likelihood of confusion between the two organizations.[3] As to the subject of public confusion, we believe the testimony of the Association members must be viewed circumspectly because of their very close contact with the Association. It is difficult to ascribe much probative value to the members' assessments of the "secondary meaning" of the Association and the likelihood of confusion by the general public, or of a circumscribed segment of the general public, about the Cincinnatus Association. The testimony of those closely connected with the plaintiff is insufficient to prove secondary meaning. *Mr. Gasket Co.* v. *Travis* (1973), 35 Ohio App. 2d 65 [64 O.O.2d 192]. Thus we find that the evidence from the members is far below clear and convincing on the issues *sub judice.*[4]

Now we come to Mr. Head's testimony. He was asked whether or not in his experience "there would be a likelihood of confusion between the name Cincinnatus Association and the use of the name of Cincinnatus by a party running candidates for election to Cincinnati City Council." He explained that he had seen a newspaper article about the formation of a new political party and his initial reaction thereto was one of confusion. Then this colloquy transpired during cross examination of Mr. Head:

"BY MR. CONDIT:

"Q. Mr. Head, you indicated when you picked up the newspaper and first read of the Cincinnatus Party — did you say some confusion arose in your mind?

"A. My initial impression from reading the headline and the first several paragraphs, as I recall, is that somehow it seemed to be linked to the Cincinnatus Association by virtue of the name, and it seemed to me a departure from their normal way of doing things.

"Q. Some of the names of the Cincinnatus Party were listed in the article. Do you recall that?

"A. That's my recollection. I think when I got to those names — and my recollection also is there was a statement by Mr. Hayes disavowing the Association. That cleared up the confusion.

"Q. So am I correct, though, that the

---

[3] The term "secondary meaning" has been injected into this cause. In the context of the matter before us, the "secondary meaning" concept implies that the general public, or a representative number thereof, has an awareness of the existence of the Cincinnatus Association and its activities — an awareness fostered by media coverage of the Association. Moreover, the term means that the public, or representative segment thereof, has come to associate the name Cincinnatus Association with a particular group of citizens whose activities and sponsorships seem valuable, civically responsible, and also worthy of consideration. Community recognition is the touchstone of "secondary meaning."

[4] The fact that some of the members testified of course was understandable. The problem for the plaintiff Association derives from reliance upon these member-witnesses almost exclusively to prove by clear and convincing evidence all the claims contained in the complaint, particularly the Association's contention that the public, or representative segment thereof, would be confused by the emergence of the Cincinnatus Party. It seems manifest that only persons who are members of the general public, or representative segment thereof, may testify convincingly as to how the public views the activities of the Cincinnatus Association and as to what extent the public associates the name "Cincinnatus" with that particular organization.

name is listed for the Cincinnatus Party also cleared up in your mind a disassociation situation? [*sic*]

"A. I'd say so, but I think it takes somebody who knows those names.

"Q. And in terms of the confusion that you have testified to, your confusion was cleared up right then upon the reading of that article, wasn't it?

"A. My personal confusion was, yes.

"Q. And are you able to testify to the Court of any — as to any other resident of this community which you know of your knowledge was confused by the use of the new party, of Cincinnatus party?

"A. I can't say that I know of anyone of my personal knowledge."

Obviously then the denouement of Mr. Head's experience with the particular newspaper story was that he was *not* confused after all.

Summarizing concisely the thrust of the Association's evidence vis-a-vis the controverted issues in the matter *sub judice,* we have the testimony of the members which as indicated we are disinclined to find sufficient to prove "secondary meaning," and Mr. Head's testimony which reflects only momentary unclearness. No other witnesses were offered in an attempt to prove that the name Cincinnatus Association has acquired a "secondary meaning" in the eyes of the public, but at least three witnesses testified for the Party that they had never heard of the Cincinnatus Association prior to the present litigation. The finding of the trial court (I, *supra*) that "the name Cincinnatus Association * * * [has a] secondary meaning as a promoter of political activities as well as its other pursuits" is not sustained by the evidence. Finding II, *supra,* "that there has been actual confusion" is overwhelmingly unjustified; almost immediately upon the genesis of the Cincinnatus Party the court below enjoined its operation. The public never had a chance to confuse it with the Association. Moreover, as indicated, the evidence offered is insufficient to establish "likelihood of confusion" either by the public in general or any representative segment thereof. The trial court found that the Association's use of the name was prior in time to the Party's "and therefore preemptive." (Finding III *supra.*) The uncontroverted evidence revealed that the Association had not preempted or attempted to preempt the name "Cincinnatus." The evidence showed that a local savings and loan company had used the name since 1885, a railway credit union since 1935, and there is a University of Cincinnati organization known as The Cincinnatus Society which a witness stated was established in 1945. Additional evidence developed that the late Mr. Alfred Segal authored the column "Cincinnatus" in the Cincinnati Post for over forty years commencing "about 1921." We discern nothing probative to show that the plaintiff Association has heretofore taken any steps to assert an exclusive right to the name "Cincinnatus."

One of the briefs explains that Lucius Quintius Cincinnatus was the famous citizen soldier of the Roman Republic after whom the city of Cincinnati was named. The name "Cincinnatus" forms the basis historically for the name of the city which obviously is adapted from it. Actually the name "Cincinnatus" is both historical and geographical. We have already explained its historical significance, and its geographical meaning flows from the fact that the name of the city is almost identical. In the analogous field of trademarks and tradenames, as a general rule, geographical names cannot be appropriated as the subject of an exclusive trademark. 52 Ohio Jurisprudence 2d 363, Trademarks, Tradenames, Section 36. Because of the geographical name obstacle and also for the reason that the evidence fails to show that the plaintiff Association did in fact preempt the word "Cincinnatus," we conclude that the find-

ing in III above is against the weight of the evidence.

Our decision in *Southern Ohio Bank* v. *Savings Assn.* (1976), 51 Ohio App. 2d 67 [5 O.O.3d 183], has been cited by counsel.[5] The Southern Ohio Bank sought a prohibition against use of the words "Southern Ohio" by defendant Southern Ohio Savings Association under any and all circumstances. The trial court (Judge Black, then a judge of the Hamilton County Court of Common Pleas) refused the plenary injunctive relief sought although decreeing certain minimal ground rules for use by the defendant of the name Southern Ohio Savings Association. *Southern Ohio Bank* was a trade practices or tradename case, but a number of its decisional statements in the trial opinion are *apropos* here. For instance:

"[Some] confusion is inevitable whenever a geographical name is used. * * *

"It is not accurate to say that there is no likelihood whatsoever that some people will patronize the savings association and not the bank by reason of motivations connected with the name. There may be some who do. However, the probability of confusion over names is so slight that it is insufficient to support a permanent injunction as sought by the bank. Whatever confusion may now or hereafter exist will be adequately cleared up if the public is informed that one organization is a bank and the other is a savings association. The public can distinguish between these two distinct types of financial institutions, just as Ohio law makes a sharp division between the two. * * *

"A careless or inattentive person might be confused, but equity does not protect the careless and the inattentive for the sole sake of purity. We must deal with the realities of life and bring the sanctions of law and equity to bear on those problems which will be likely to cause substantial difficulty for the reasonably prudent and careful person. The proof in this case does not reach that level. *United States Plywood Co.* v. *United Plywood Corporation*, 161 A. 913 (Del. Ct. Chance. 1932), *Central Mutual Auto Ins. Co.* v. *Central Mutual Ins. Co.*, 275 Mich. 554, 267 N.W. 733 (1936), *Lerner Stores Corp.* v. *Lerner*, 162 F.2d 160 (C.A. 9, 1947).

"The public can distinguish between the business of a bank and that of a savings association. They are distinctly different. The services of one are not the services of the other. The savings association has not passed itself off as a bank."

In *Southern Ohio Bank* we affirmed the trial court's rejection of plaintiff's prayer for overall injunctive relief, holding that there was more than adequate credible evidence to support the findings, conclusions and judgment below. In the instant matter the judgment granting the permanent injunction is against the manifest weight of the evidence. Resultantly, we sustain the sole error assignment and reverse the judgment.[6]

We modified the judgment in *Southern Ohio Bank* by requiring Southern Ohio Savings Assn. to use a certain disclaimer. In so doing we relied upon the authority granted in Section 3(B)(1), Article IV of the Constitution of Ohio investing the courts of appeals with jurisdiction "in any cause on review as may be necessary to its complete determination," and upon Section 3(B)(2), Article IV, and App. R. 12(B).

---

[5] The motion to certify *Southern Ohio Bank* was overruled, February 11, 1977.

[6] Appellee urges that appellants in using the name Cincinnatus Party are in violation of certain statutes of R.C. Chapter 4165 relating to deceptive trade practices. Assuming *arguendo* that such sections apply, about which we have serious doubt, we find no violation thereof requiring an injunction against the use of the name "Cincinnatus" by defendants-appellants.

Thus upon constitutional authority and that derived from the Appellate Rules we enter the following order which we find necessary to a complete determination of the cause on review, such determination including obviation of further litigation — seemingly unlikely but possible — which could derive from the anticipated coexistence of the parties herein:

In any written or printed form or document to be used by appellant Party and intended to be communicated to any member of the public, there appear prominently displayed thereupon a disclaimer such as NO AFFILIATION WITH THE CINCINNATUS ASSOCIATION (not necessarily *in haec verba*); and, further that in any advertising in the mass media using the name Cincinnatus Party — including press releases — there similarly appear at least a concise explanation that the Cincinnatus Party is not affiliated with the Cincinnatus Association.

As indicated, we reverse the judgment below and also order the disclaimer as herein expounded.[7]

*Judgment reversed.*

BLACK, P.J., and DOAN, J., concur.

BLACK, P.J., concurring. I concur in the judgment of my brothers but I believe that a brief word of explanation is appropriate.

The word "Cincinnatus" has a generally recognized historical meaning that has an obvious geographical connection with our community. It is not a unique name like Xerox, Xomox, Xtek, and others of similar ilk having a distinctness that by itself would entitle the first user to exclusive use. "Cincinnatus" is similar to "Southern Ohio" because it has no inherent claim to exclusivity.

As to the claim of secondary meaning, the record fails to establish that the Cincinnatus Association has endowed "Cincinnatus" with such prominence in the community that the Association is entitled to preclude its use by any other organization that enters the political field. We are not concerned with an industrial product, a commercial enterprise or a financial institution. We are in the political arena, the public sector, the market place of ideas and issues, where freedom of speech and assembly outweigh all other considerations except the most basic demands of public safety and decency. Any persons who assert that their prior use of a general term entitles them to exclusive rights therein have two major burdens to carry: they must demonstrate, first, that their use of the term has created a meaning of primary political importance that overrides the term's ordinary or common meaning, and second, that it is proper and fair to prohibit the use to all other organizations that enter

---

[7] Case authoritites cited and argued on behalf of the parties concern trademark and tradename infringement, trade practices and product similarity. No case has been cited to us and our own independent research of reasonable proportions develops none which involves the political sphere as in the matter before us. We believe, as we have referenced in the opinion proper, that the rationale of the commercial cases applies to the matter *sub judice* and supports our conclusion, especially *Southern Ohio Bank* v. *Savings Assn., supra*. We theorize that possible confusion between names in the political sphere, absent any intent

to confuse or mislead, should be viewed less restrictively than in the commercial field. We do not view such construction as conflicting in any way with the proscriptions of R.C. 3517.01(A).

Although in no way raised in this appeal, the question occurs to us whether the appellants (Cincinnatus Party and other defendants) are legally and technically qualified to use the word "party" within the provisions of R.C. Title 35, "Elections," particularly R.C. 3517.01(A). Of course the issue is not before us.

the political field, whether to take positions on community issues or to sponsor and promote candidates with a particular bias. These burdens must be met by an extraordinary degree of proof for a civil case: by clear and convincing evidence. Plaintiff did not meet those burdens in this case. As much as the Cincinnatus Association may stand out as a nonpartisan and bipartisan civic action group that wrestles with public issues and takes forthright stands favoring good government, the evidence did not establish a secondary meaning that would support exclusive use.

At the same time, the evidence of past use of "Cincinnatus" in plaintiff's special way, when combined with our judgment that conflict with defendants' intended future use might possibly cause confusion, is sufficient to require that defendants publish a disclaimer so that the voting public will not be misled about the origin of the Cincinnatus Party or about its non-affiliation with the Cincinnatus Association.