MEAD CORPORATION, DICONIX, INC.,
SUCCESSOR, APPELLEE, *v.*
LANE ET AL., APPELLANTS.

(No. 1089—Decided
September 8, 1988.)

*Biebel, French & Nauman* and
*John W. Donahue,* for appellee.
*James T. Boulger,* for appellants.

WHITESIDE, J. Defendants, Paul
M. Lane and Ink Jet Products, Inc., appeal from a judgment of the Ross
County Court of Common Pleas and
raise seven assignments of error as
follows:

"1. The court erred as a matter
of law in failing to require plaintiff to
prove its cause of action by clear and
convincing evidence.

"2. The court erred as a matter
of law in holding that the fact of the existence of a non-exclusive license between plaintiff and the * * * [ABC] Ink
Company can constitute a trade secret
of plaintiff's so as to create standing in
plaintiff to prevent the use of a similar
non-exclusive license between defendant and the * * * Ink Company.

"3. The court erred to the prejudice of the defendants in denying
defendants' motion to dismiss the complaint for failure to join an indispensable party, which motion was made at
the conclusion of plaintiff's case.

"4. The court's finding that the
plaintiff made a reasonable effort to
prevent the production processes for
its BW100 ink and the purge fluid from
disclosure is against the manifest
weight of the evidence.

"5. The trial court's finding that
the fluid formulas at issue were not in
the public domain is against the manifest weight of the evidence.

"6. The court erred to the prejudice of defendants in denying defendants an opportunity to fully develop
evidence relevant to the equitable
maxim of clean hands by (1) vacating
the joinder of the additional parties,
Roger Gamblin and Bradford Chemical
Company, and (2) quashing the subpoena duces tecum served upon Roger
Gamblin and the Bradford Chemical
Company. The court further erred in
failing to consider competent, uncontradicted evidence indicating plaintiff's lack of clean hands.

"7. The trial court erred as a
matter of law in issuing a permanent
injunction which does not comply with
the mandates of Rule 65 of the Ohio
Rules of Civil Procedure."

Plaintiff, Mead Corporation,
brought this action seeking a preliminary and permanent injunction en-

joining defendants from utilizing trade secrets of plaintiff for the production of charge plates, orifice plates or jet printing inks, from selling any such plates or inks through use of plaintiff's trade secrets, and from disclosing any such trade secret of plaintiff to any third party and enjoining defendant, Paul M. Lane, from making further disclosure of any trade secret of plaintiff to any officer, employee or agent of defendant, Ink Jet Products.

In the complaint, plaintiff alleged that it is a national leader in the development of ink jet printing systems, including charge plates and orifice plates, and that its systems require a jet printing ink having special characteristics, and that such plates and inks are produced through secret processes developed at great expense by plaintiff. The complaint further alleges that defendant Lane is an employee and principal shareholder of defendant, Ink Jet Products, which is producing or making preparation to produce charge plates, orifice plates and jet printing ink in competition with plaintiff.

The complaint further alleges that from September 22, 1964 to May 31, 1982, defendant Lane was employed by plaintiff in positions of special trust and confidence making him a key participator in the research leading to the development of plaintiff's orifice plate and charge plate production processes and, also, had full access to plaintiff's secrets relating to production of jet printing inks. The complaint further alleges that in 1970, defendant Lane signed an "Inventions Agreement" acknowledging an obligation of confidence in connection with secrecy of information. Defendants filed an answer to the complaint and plaintiff filed an amended complaint in which the allegations are concentrated upon defendants' alleged use of plaintiff's secrets relating to the production of jet printing ink and purge fluids. A 1964 Inventions Agreement allegedly signed by defendant Lane was attached to the amended complaint. Defendants denied both that the inks and purge fluids produced by plaintiff either have special characteristics or were produced by secret processes developed at great expense. Defendants also denied that defendant Lane was aware of the secrecy of information with which he was entrusted as an employee and denied that he violated any obligation of confidence by disclosing information to defendant Ink Jet Products. Defendants also assert other defenses, including those of satisfaction, release, laches, clean hands, and unlawful restraint of trade. Defendants attempted to assert two additional counterclaims, but eventually were denied leave to do so by the trial court.

During the course of these proceedings plaintiff has changed and, at this time, Diconix, Inc. has been substituted as party-appellee in place of plaintiff, Mead Corporation, and the title of the action has been amended to include the designation following "Mead Corporation," of "Diconix, Inc., Successor."

The matter eventually came on for trial, and the trial court found for plaintiff, making extensive and detailed findings of fact including the following:

"1.  The plaintiff, Mead Corporation, is a major paper and forest products company headquartered at Dayton, Ohio. In the late 1960's, plaintiff began work on the development of an ink jet non-contact printing process which eventually became capable of printing 60,000 lines of text per minute. It utilizes 48 million droplets of ink per second. The droplets are computer controlled — the printing droplets striking the paper and the nonprinted areas have droplets di-

verted electrically so that they are recirculated back through the printing machine. * * *

"2. The defendant, Paul M. Lane, began work at the Mead Corporation, Chillicothe, Ohio, as a laboratory assistant on September 21, 1964. * * * Upon initial employment, he signed a 'nondisclosure agreement' which provided that he would never reveal to anybody any information, knowledge or data concerning inventions, processes; or, in general, secret or confidential affairs of plaintiff. * * * In 1969, defendant, Paul Lane, became involved in jet printing project.

"3. Early in the development process, fountain pen inks were available on the commercial market. From an early research publication, plaintiff discovered these inks could be used for jet printing. Ink manufactured by ABC company worked well in the print head. As modifications progressed, it was found that problems arose with the use of commercial ink. * * * The commercial ink caused corrosion of the orifice which affected the print life of the plate. Ink drying time was important. In short, chemical compounds were added to the commercially available ink to achieve compatibility with the print head. Environmental standards had to be met to protect the users of the product. * * *

"3 [sic]. A purge fluid also had to be developed to clean out the printer system after the printing job was completed.

"4. In the early 1970's, the Chillicothe research on digital printing was transferred to Dayton, Ohio Research Park. Paul Lane was transferred with the project. At about this time, the plaintiff decided that the ink jet printing process had commercial possibilities. On September 21, 1970, Paul Lane executed a second agreement which essentially provided:

" 'I will not disclose at any time either during or subsequent to my employment, any information, knowledge [or] data of Mead which I may develop or receive during the course of my employment relating to inventions, formulas, plans, records, techniques, business operations or other matters which are of proprietary or confidential nature; and, I will deliver to Mead upon termination of my employment all documents, equipment and other records of such information, knowlege or data.'

"5. In late 1970's, the market for foundation pen ink was in decline and Mead's supplier, ABC, notified plaintiff it was going to cease production of the basic ink plaintiff had been purchasing on the commercial market. On June 1, 1978, Mead negotiated a non-exclusive license agreement with its former supplier, ABC, for the formula in order to assure itself of the foundation for its jet ink production. In the licensing agreement, it was stipulated that the licensor's formula was proprietary for ABC and that Mead was to entrust the formula only to trusted employees necessary in the formulation of its jet ink for sale to Mead customers. * * * At this time, defendant, Paul M. Lane was in charge of Mead Digital Ink production and the formula and mixing proceedure [sic] was placed in his charge. Lane's management responsibility was building and refurbishing print heads as well as jet ink production. * * *

"6. * * * The plaintiff, at the time of trial, had 54 of the model 2700 printers on the market. About half was sold. The remaining half was under lease. Whether under sale or lease, Mead owns the print head. It requires 5 printheads for each machine. * * * Plaintiff has a contractual obligation with its customers to refurbish print heads. * * *

"7. In 1980, Paul Lane * * * was responsible for maintaining and

establishing proceedure [*sic*] to protect trade secrets and Mead Digital Systems proprietary interests. * * * In early 1981, the research department was undergoing change and Paul Lane was offered a lateral transfer without reduction in salary. * * * Apparently dissatisfied, Paul Lane began negotiations for terminal pay. On May 19, 1982, Lane, through an attorney, had a letter of resignation prepared. * * * The resignation letter in part provided:

" 'I further understand that by consenting to this release, Mead Digital Systems knows of no legal actions which it has or could be initiated against me as a resulf [*sic*] of my employment; and, further that the Mead Corporation and its subsidiaries agree not to initiate any action against me as a result of my employment with them.'

"* * *

"8. Immediately after resignation, on June 2, 1982, Lane accepted employment with Dayton Tinker Corporation. Dayton Tinker was involved in textile printing, using an ink jet process for injecting dye colors into fabric.

"* * * Mead immediately wrote Dayton Tinker and Paul Lane cautioning both that Mead trade secrets were confidential and not to be violated. * * * Paul Lane responded in a letter and advised Mead that he would not disclose Mead proprietary and confidential information.* * *

"Paul Lane was employed to manufacture orifice plates for Tinker. While so employed by Tinker, he testified that he was asked about Mead ink formulations and he refused to divulge the process to Tinker, telling the President of Tinker that he was afraid that Mead would use [*sic*] him if he revealed this information. For this reason, Lane said he was discharged. Also, while employed by Tinker, he utilized his time to put together his company, Ink Jet Products, obtain a

building, equipment and supplies. In August, 1982, Lane contacted Mead's Licensor, ABC, for the prospect of acquiring a license for himself. * * *

"9. * * * On October 26, 1982, Ink Jet Products produced its first jet ink. The first production was 200 gallons. No test runs or laboratory experiments were performed. 450 gallons of defendant's ink was delivered to Mead customers for use in Mead Digital Printers. No charge was made for this ink. Defendant had not yet obtained a license from ABC to use its formula.

"Sales of defendant's ink began in January, 1983, after defendant obtained a license for use of the ABC ink formula. Defendant has penetrated at least 5% of plaintiff's market. The price for defendant's ink is substantially lower than for the plaintiff's product. Defendant also produces and sells purge fluid for cleaning print heads at a lower price.

"10. From the evidence, the Court finds it is clear and convincing that defendant's ink and start up fluids are practically identical with plaintiff's jet inks and purge fluids. Differences are minor and inconsequential.

"11. The jet ink product of defendant is not solely the ABC ink for which defendants procured a license. Defendants also use the additives (and in the same proportions) that plaintiff developed through a long and expensive process for use with their [*sic*] non-contact jet ink printer.

"* * *

"14. Without being specific, both parties' ink[s] have twelve (12) constituents in substantially identical proportions. Seven (7) of these constituents, including water, are from the ABC formula. The additional five constituents were added through the process evolved by Mead to develop an ink suitable for use in its jet printer."

At its conclusions of law, the trial

court found that "[p]laintiff is entitled to the protection of 'trade secret' status in its process for making its jet printing inks." The court also found that "[d]efendant, Paul Lane, breached his confidential relationship with plaintiff and appropriated the process for his own use. The fact that it might have been discovered by others is no basis to excuse a breach of trust between the employer and employee." The trial court further found in conclusion No. 5 that "the letter of resignation prepared by the defendant, Paul Lane, was deliberately designed to mislead plaintiff as to its purpose."

The trial court entered an order enjoining defendant from "making or using, disclosing or selling to others, ink, purge, and/or start up fluid compositions which are identical to or which differ in minor inconsequential respects to, those produced by Plaintiff at the time Defendant Lane left Plaintiff's employment." The court also similarly enjoined defendants with respect to "inks, purge, and/or start-up fluids which differ from Plaintiff's BW-100 ink and start-up fluid only through the addition or substitution of substances that have no effect on the functional or operational qualities of the ink, purge, and/or start-up fluid." The order also enjoins defendants from "making or using, disclosing or selling to others, any of the inks, purge, and/or start-up fluids of Plaintiff in a modified or improved form where the modification or improvement is derived from knowledge of the composition of such of Plaintiff's inks, purge, and/or start-up fluids." A similar injunction was ordered with respect to certain specified ink jet products. Defendants also were enjoined from disclosing to any other person information which defendant Lane received in confidence from the plaintiff. As the last part of the injunction, defendants were permanently enjoined from "making or using, disclosing or selling to others any jet printing inks which utilized the formula provided to Defendants in connection with the License Agreement with ABC Company."

By the first assignment of error, defendants contend that the trial court erred in failing to require proof by clear and convincing evidence of the facts entitling it to an injunction. Plaintiff at first contends that proof by a preponderance of the evidence is sufficient in a trade-secret case even though injunctive relief is sought. Then plaintiff contends that the trial court in fact applied the clear and convincing evidence standard in making its factual findings.

Even though, as plaintiff contends, some states may not require proof by clear and convincing evidence to justify injunctive relief in a trade secret case, Ohio does. Plaintiff has not cited a single authoritative Ohio case which has found it proper to grant an injunction in a trade secret case even though a right to such relief has not been established by clear and convincing evidence. Cases suggesting that clear and convincing evidence must be adduced to justify an injunction include: *Southern Ohio Bank* v. *Southern Ohio Savings Assn.* (1976), 51 Ohio App. 2d 67, 5 O.O. 3d 183, 366 N.E. 2d 296; *Cincinnatus Assn.* v. *Cincinnatus Party* (1981), 2 Ohio App. 3d 184, 2 OBR 201, 441 N.E. 2d 575; and *Countywide Heating & Cooling, Inc.* v. *Horton* (1982), 8 Ohio App. 3d 174, 8 OBR 234, 456 N.E. 2d 827, all of which involve trade names rather than trade secrets.

In *Countywide*, it was expressly held that the clear and convincing standard must be applied. We find no reason to adopt a different standard for a trade secret case. Rather, in the light of the nature of the injunctive relief sought and granted in this case, clear and convincing evidence as a matter of policy should be the standard for

granting relief. See *Household Finance Corp.* v. *Altenberg* (1966), 5 Ohio St. 2d 190, 34 O.O. 2d 348, 214 N.E. 2d 667, as to what constitutes clear and convincing evidence.

In this context, a distinction must be made between those trade-secret cases in which injunctive relief is sought and those trade secret cases in which monetary damages are sought. Cf. *Household Finance Corp., supra.* In order to be entitled to injunctive relief, the complainant party must prove his case by clear and convincing evidence. However, in order to be entitled to recover damages with respect to trade secret violations, proof by a preponderance of the evidence may well be sufficient.

Turning, however, to the issue of whether the trial court erred in this respect, we find no indication that the trial court made its factual findings only by a preponderance of the evidence. Rather, the only references in the trial court's decision and findings of fact are to the clear-and-convincing-evidence standard. For example, see paragraph ten of the findings of fact, quoted *supra.* Since reviewing courts presume regularity rather than irregularity in trial court proceedings, in the absence of an indication that the trial court applied the wrong evidentiary standard, we will assume that the right standard was applied in making factual findings, provided the evidence is such as to permit the factual findings to be made by that evidentiary standard, in this case, clear and convincing evidence. The latter provision, however, is an issue pertaining to the weight of the evidence, not raised by the first assignment of error, which for reasons stated above, is not well-taken.

By the second assignment of error, defendants contend that the trial court erred in holding that the existence of the nonexclusive licenses beween ABC Ink Company and plaintiff can constitute a trade secret so as to create standing in plaintiff to prevent the use of a similar nonexclusive license between defendants and ABC. We agree. Despite protestations of plaintiff, and the conclusions of the trial court, we find no predicate for the issuance of that part of the injunctive relief enjoining defendants from using the formula obtained from the ABC Ink Company as to which plaintiff has only a nonexclusive license agreement. It is the use of plaintiff's secret formula through adding additives to the ABC ink to create its own product that constitutes the trade secret. The trade secret is not the use of the ABC formula under a nonexclusive license agreement for an ink that previously was commercially available on the open market, but is no longer sold by the holder and owner of the formula. The trial court's conclusion is apparently predicated upon a finding that information that plaintiff's license was nonexclusive was confidential information. There is nothing in either the findings of fact or the evidence supporting such a conclusion of law.

In its brief herein, Mead states in part: "Appellee will readily admit that appellants are free to market fountain-pen ink based upon the * * * [ABC] formula, provided they are able to obtain * * * [ABC's] permission so to do." Despite this admission by plaintiff, the injunction expressly prohibits defendants from using ABC's formula to produce ink, under the permission from ABC which defendants now have. As Mead points out in its brief, it is "the fact that appellee uses * * * [ABC's] secret formula as part of a mixture including other ingredients is not known to the trade." Thus, the injunction, if any should be issued, should be limited to enjoin defendants from divulging the fact that the base of plaintiff's ink is the formerly freely

marketed ABC ink. Despite its concession, plaintiff continues to contend that the second assignment of error is not well-taken. The assignment of error is directed to the portion of the injunction preventing use by defendants of their nonexclusive license from the ABC company to use the ABC formula to produce ink. Accordingly, the second assignment of error is well-taken.

By the third assignment of error, defendants contend that the trial court erred in denying the motion to dismiss the complaint for failure to join an indispensable party.

Defendants contend that ABC Company, as licensor of the ink formula used by both parties, necessarily was an indispensable party to the proceedings. The contention, however, is predicated upon the same portion of the injunction as is the second assignment of error, namely, the portion enjoining defendants from "making or using, disclosing or selling to others, any jet printing inks which utilized the formula provided to Defendants in connection with the License Agreement with ABC Company." Defendants contend that the effect of the trial court order is to change plaintiff's license from a nonexclusive license to an exclusive license from ABC Company to the detriment of ABC Company. Second, defendants point out that there is a $1,500 annual fee to be paid by defendants to ABC Company which they contend will be lost to ABC Company by the injunction. However, the injunction does not enjoin defendants from paying the annual fee, only from using the formula for which the fee is paid. Thus, there is no loss to ABC unless defendants refuse to make the $1,500 annual fee payment.

We tend to agree that to some extent the order of the trial court, in effect, makes plaintiff's license from ABC exclusive, rather than nonexclusive, with respect to former employees of Mead. There is no equitable basis for imposing such a restriction, since it is not the ABC ink formula that is a secret process but, rather, the ABC ink only forms a base for plaintiff's ink which is produced by the addition of eleven additives to the base ink. As noted in connection with the second assignment of error, the fact that the base is ABC ink may be a trade secret as is the formula for producing the finished product, using as a base the ABC ink. Thus, we sustain the second assignment of error.

However, the third assignment of error is not well-taken, because for the very reasons that we sustained the second assignment of error, ABC Company is not an indispensable party to these proceedings. Accordingly, the third assignment of error is not well-taken.

By the fourth assignment of error, defendants contend that the trial court's findings that plaintiff made reasonable efforts to prevent disclosure of its processes for its ink and purge fluids is against the manifest weight of the evidence. We disagree. Without an exhaustive review and analysis of the evidence, there not only is competent, credible evidence supporting the finding of the trial court, which is the test in the ordinary manifest-weight situation (see *C.E. Morris Co.* v. *Foley Constr. Co.* [1978], 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578), but there is sufficient evidence to permit a reasonable finder of fact to conclude that there is clear and convincing evidence that plaintiff made a reasonable effort to prevent disclosure of its production processes for its ink and purge fluid. This is not to say that there may not be evidence that would have supported a contrary conclusion, if accepted by the trial court. However, the credibility of witnesses and the weight to be given to evidence is in the first instance for the

trial court. Only where the trial court's conclusion as to the credibility or weight is manifestly incorrect will a reviewing court find a judgment to be against the manifest weight of the evidence.

R.C. 1333.51(A)(3) provides a definition of "trade secret." The processes in question constitute a trade secret within that definition. There is clear and convincing evidence that the processes have "not been published or disseminated, or otherwise become a matter of general public knowledge." In fact, even in this case, Mead has sought and obtained from the trial court an order implementing procedures designed to prevent the processes from being published or disseminated and becoming a matter of general public knowledge. The statute further provides that processes such as herein involved are "presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes." There is clear and convincing evidence presented by plaintiff permitting a finding by the trial court that plaintiff took such measures.

In *Water Management, Inc.* v. *Stayanchi* (1984), 15 Ohio St. 3d 83, 15 OBR 186, 472 N.E. 2d 715, the Supreme Court held in the syllabus as follows:

"1. There is no presumption that any particular idea imparted to or acquired by an employee is a trade secret unless the possessor takes active steps to maintain the secrecy. (R.C. 1333.51[A][3], construed.)

"2. Applying R.C. 1333.51(A)(3), a trial court should examine those facts which show the extent to which information is known outside the business and the precautions taken to guard the secrecy of the information."

From the evidence adduced, the trial court could reasonably find that the only information concerning plaintiff's ink and purge fluid known outside its business was the information of ABC that plaintiff is licensed to use the ABC formula in producing ink and the knowledge that defendant Lane imparted to others connected with defendant Jet Products, Inc. The trial court found (albeit as a conclusion of law) that the security measures adopted and used by plaintiff were adequate and that there is no evidence that any third party has become aware of the process as a result of lack of security. As a conclusion of law, however, the trial court did find that security was lacking, and that it might have been discovered but, in fact, there is no evidence that it was discovered by any stranger to Mead research.

At most, the evidence adduced by defendants would demonstrate a possibility that the fact of use of the ABC formula as a base for the Mead ink does not constitute a trade secret. However, the additional process by which Mead ink is made through use of additives is clearly a trade secret. Since we have sustained the second assignment of error, any error in finding the fact of use of the ABC formula as a base for the Mead ink to be a trade secret is not prejudicial. There is simply no reason for defendants to publicize that fact and under the equities of the situation, such publication could be harmful to Mead, while at the same time not benefiting defendants. Accordingly, the fourth assignment of error is not well-taken.

The fifth assignment of error is related to the fourth, but pertains to the trial court's finding that the fluid formulas are not in the public domain, which finding defendants contend to be against the manifest weight of the evidence. This contention is predicated upon the existence of a two-volume

history of plaintiff's ink jet development, which defendants contend is in the files of the United States Court of Appeals for the Sixth Circuit without a secrecy order being involved. However, the only information contained in that history which could be argued to be in the public domain is the use of the ABC formula as a base ink. Accordingly, for the reasons stated in connection with the fourth assignment of error, the fifth assignment of error is not well-taken.

By the sixth assignment of error, defendants contend that the trial court erred by vacating the joinder of additional parties, Roger Gamblin and Bradford Chemical Company, and quashing the subpoena duces tecum served upon them. We find no prejudicial error under the circumstances. The attempt to enjoin additional parties was very late in the proceedings. The attempted joinder was only a short time before the date set for trial. Granting joinder would have, as the trial court pointed out, necessitated delaying the completion of the case. Whether to allow amendment of pleadings is governed by Civ. R. 15, and lies within the sound discretion of the trial court. Only if there be an abuse of discretion, will a reviewing court interfere. To constitute an abuse of discretion, the action must have been unreasonable, arbitrary or unconscionable. We find no abuse of discretion. It was well within the discretion of the trial court to deny joinder of the additional parties. Likewise, an abuse of discretion has not been demonstrated with respect to the quashing of the subpoena duces tecum. Accordingly, the sixth assignment of error is not well-taken.

By the seventh assignment of error, defendants contend that the injunction issue does not comply with the requirements of Civ. R. 65(D) that "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained * * *." Defendants rely upon various federal cases including *Schmidt* v. *Lessard* (1974), 414 U.S. 473. However, the holding of that case is that the specificity provisions of the federal rule comparable to Civ. R. 65(D) are not merely technical requirements, but are designed to prevent uncertainty and confusion with respect to injunction orders. Here, we find no lack of specificity, especially when the order is read in light of the sealed information protecting plaintiff's trade secret.

Particularly, defendants contend because the permanent injunction prohibits them from disclosing information which defendant Lane received in confidence from plaintiff, from using ink jet formulas with operational qualities similar to plaintiff's, and from using fluid compositionally similar to plaintiff's, that these statements are too vague. However, specificity, not perfection, is required by Civ. R. 65(D). Only sufficient detail as to advise the defendants of the conduct which they are prohibited from engaging in is required. It is not necessary that every conceivable situation be covered in minute detail. Specific types of conduct may be enjoined, even though it might be possible to enumerate numerous examples of each type of conduct. Defendants have not demonstrated that the injunction is not sufficiently specific to permit defendants to comply without fear of unwitting violation. For example, paragraph E of the injunction precludes defendants from disclosing information defendant Lane received in confidence from plaintiff. In context, necessarily the information pertains only to jet

printing ink, start-up and/or purge fluid. Although if lifted out of context, some confusion might occur, in context, the limits of the injunctive relief granted is clear and there is sufficient specificity to comply with the requirement of Civ. R. 65(D). Accordingly, the seventh assignment of error is not well-taken.

For the foregoing reasons, the second assignment of error is sustained, and the remaining six assignments of error are overruled, and the judgment of the Ross County Court of Common Pleas is affirmed except with respect to the injunctive relief granted by paragraph F of the judgment from which this appeal was taken pertaining to use of the ABC formula, and as to that portion of the injunctive relief the judgment is reversed, and this cause is remanded to the trial court with instructions to modify its judgment so as to delete paragraph F therefrom.

*Judgment reversed in part,*
*affirmed in part*
*and cause remanded*
*with instructions.*

STEPHENSON and ABELE, JJ., concur.

ALBA L. WHITESIDE, J., of the Tenth Appellate District, sitting by assignment in the Fourth Appellate District.