OPINION
{¶ 1} Defendant-Appellant Charles J. Lofino Grandchildren's Trust (Lofino) appeals from an order granting a permanent injunction in favor of Plaintiffs-Appellees Outback/Buckeye II, Limited Partnership and Cheeseburger-Buckeye, Limited Partnership (Outback and Cheeseburger). Lofino contends that the trial court erred by failing to enforce the clear and unambiguous termination provisions of the parties' contracts and by misinterpreting the meaning of a contract term, "Landlord's Work." Lofino further contends that the trial court erred by failing to comply with Civ. R. 65(D) and with Civ. R. 60(B) when it issued and then later modified the permanent injunction.
 {¶ 2} We conclude that the trial court did not err in granting the permanent injunction. The court did err in failing to comply with Civ. R. 65(D), but the error was harmless. The trial court also erred in modifying the permanent injunction and entering an emergency order. Leave should have been obtained from the court of appeals, given that the permanent injunction order had already been docketed. Accordingly, the judgment of the trial court is Affirmed in part, and Reversed in part, and this cause is Remanded for further proceedings.
 I {¶ 3} On August 25, 2004, Outback and Lofino entered into a lease agreement for 1.56 acres located in a shopping center known as "The Shoppes at Fairfield Commons." Lofino owned the land, and Outback planned to build a facility of up to 7,000 square feet that would house an Outback Steakhouse. On the same date, Cheeseburger also entered into a lease agreement with Lofino for a 1.26 acre parcel located in the same shopping center. Cheeseburger intended to use the premises to build a restaurant called "Cheeseburgers in Paradise."
 {¶ 4} Both lease agreements contained essentially the same terms, and included "Exhibit A," which was a four-page attachment. Exhibit A depicted the "Premises" and "Permitted Restaurants" (A-1 ); a "Protected Area" (A-2); a "No-build Area" and a "Restricted Area" (A-3); and the "Landlord's Improvement Area" (A-4). The preliminary term of the leases began on their "Effective Date" (August 25, 2004), and was to end on or before 90 days later, with Lofino's tender of possession. At that time, Lofino was to have used "diligent good faith efforts" to have "Landlord's Work, as set forth in Section 5.1 completed." See Article I, Section 1.3(B). The leases also provided for an "Outside Tender Date" of 120 days after the Effective Date, at which time Outback and Cheeseburger could terminate the lease if tender of possession had not yet occurred.
 {¶ 5} Following tender, Outback and Cheeseburger had a period of time for construction before their initial lease term of ten years would begin. They could then renew the leases four times consecutively, for five years each time. After the leases expired, Outback and Cheeseburger were required to surrender the premises within thirty days.
 {¶ 6} Article I, Section 1.5 of the leases outlined contingencies relating to inspection, permits and approvals, and title and survey review, and gave the tenants a right of termination if various contingencies were not met. Article I was followed by Article II (Rent), Article III (Utilities), and Article IV (Conduct of Business by Tenant).
 {¶ 7} Improvements were discussed in Article V, which contained the following sections: (1 ) "5.1 Landlord's Work"; (2) "5.2 Tenant Contribution"; (3) "5.3 Tenant's Work"; and (4) "5.4 Ownership of Improvements." Section 5.1 stated, in pertinent part, as follows:
 {¶ 8} "The following work (collectively `Landlord's Work') shall be done by Landlord exclusively, at Landlord's sole cost and expense:
 {¶ 9} "(a) within 60 days from the date Tenant waives its contingencies as set forth in Section 1.5 of this Lease Date, Landlord shall have completed the work required (and provided Tenant with written verification of such completion) to provide that the following utilities are delivered underground to within five feet (5') of the proposed Building to be located on the Premises stubbed to the location designed for connection of such utilities on Tenant's final plans, operational and with sufficient capacity: (a) 120/208 volt, 1200 amps, 3 Phase electric line; (b) 11/2" water meter with 2" water line providing water pressure between 50 PSI and 70 PSI; (c) 6" gravity sewer line to a depth sufficient to accommodate Tenant's standard plumbing plan, and acceptable by local municipalities and utility companies; (d) 4" fire main; (e) 1" irrigation meter; (f) 3.5 million BTU gas line; (g) storm water management system; and (h) telephone conduit.
 {¶ 10} "(b) within sixty (60) days from the date Tenant waives its contingencies set forth in Section 1.5 of this Lease, Landlord shall have constructed, pursuant to plans and specifications approved by Tenant, all necessary improvements and infrastructure for the Shopping Center located within that area designated on the Site Plan as `Landlord's Improvement Area' or any other work which is necessary to allow Tenant to obtain permits and approvals for construction of Tenant's intended improvements, and upon completion of those improvements to obtain a Certificate of Occupancy therefore, including without limitation, the parking areas, driveways and access roads (including all appropriate curb cuts and curbing), landscaping and irrigation, and lighting"
 {¶ 11} "(c) None of the work as set forth in subparagraphs (a) and (b) above (collectively `Landlord's Work') shall be commenced unless and until written plans and specifications have been submitted and approved by Tenant, in Tenant's reasonable discretion (hereinafter called the `Landlord's Plans'). The Landlord's Plans shall include plans for all site work included in Landlord's Work. Landlord, at its sole cost and expense, shall prepare and submit the Landlord's Plans to Tenant within sixty (60) days from the Effective Date. Tenant shall have fifteen (15) days from receipt thereof to disapprove the Landlord's Plans. Any disapproval shall contain the specific changes desired by Tenant to obtain its approval. Tenant shall have five (5) days from receipt thereof to disapprove any revised Preliminary Plans. If Landlord and Tenant are unable to agree on the Preliminary Plans on or before sixty (60) days after the Effective Date, then Tenant or Landlord shall have the option of terminating this Lease upon written notice to the other party whereupon this Lease shall be of no further force and effect, Tenant shall be released from all obligations hereunder, and Tenant shall be immediately refunded all previously paid deposits, if any. The Preliminary Plans, as approved by Landlord and Tenant, shall be the `Final Plans.'
 {¶ 12} "(d) On or before ninety (90) days from the Effective Date, Landlord shall have obtained all necessary permits, approvals or licenses required for Landlord's Work in accordance with the Final Plans (the `Landlord's Work Permits'). In the event Landlord is not able to obtain the Landlord's Work Permits within the aforementioned time period, Tenant shall have the right to terminate the Lease whereupon this Lease shall be of no further force or effect, Tenant shall be released from all obligations hereunder, and Tenant shall be immediately refunded all previously paid deposits, if any, and such right of termination shall continue until such time as the Landlord obtains the Landlord's Work Permits.
 {¶ 13} "Landlord shall substantially complete Landlord's Work by not later than the dates herein provided. As used in this Lease, the term `substantially complete' shall mean, notwithstanding Tenant's possession of the Premises, that (a) Landlord's Work has been completed with the exception of minor items which can be fully completed prior to the completion of Tenant's Work (hereinafter defined) without material interference with Tenant's activities within the Premises and (b) a Certificate of Completion and/or a Certificate of Inspection, if any, has been unconditionally issued by the appropriate governmental agency for Landlord's Work. Landlord agrees to perform Landlord's Work in a good and workmanlike manner, utilizing first quality new materials in compliance with all applicable laws, ordinances, rules, and statutes.
 {¶ 14} "* * *
 {¶ 15} "Notwithstanding anything contained in this Lease to the contrary, if Landlord fails to complete any of Landlord's Work by the date(s) provided herein, or it is reasonably anticipated that Landlord will not complete such work by the date(s) herein provided, and as a result thereof, Tenant is (or will be) unable to obtain a building perm it or a certificate of occupancy pursuant to Tenant's construction schedule, Tenant shall have the right, but not the obligation, upon twenty-four (24) hours notice to Landlord, to complete Landlord's Work and deduct the amounts incurred, together with interest at the lesser of (a) the maximum rate permitted by law, or (b) the Prime Rate of Interest as set forth in the Money Rates section (or successor section) of the Wall Street Journal on the date Landlord's payment to Tenant was due (or the following business day) plus five percent (5%) against the next ensuing Rent payments and there shall be an abatement of all Rent and other charges payable as Rent, until such time as such necessary work is completed."
 {¶ 16} The base rent for the premises was $65,000 per year for years one through five, and $71,500 per year for years six through ten, plus a pro-rata share of real estate taxes and operating expenses, like trash removal, from the common areas of the shopping center. In Section 5.2 (Tenant's Contribution), Outback and Cheeseburger each agreed also to pay Lofino $100,000 as "reimbursement towards Landlords's Work," for a total reimbursement of $200,000.
 {¶ 17} Exhibit A-4 to the lease agreements clearly includes the restaurant premises or sites, as well as common areas, within what is labeled as the "Landlord's Improvement Area." Lofino submitted drawings for the Landlord's Work in part of the Landlord's Improvement Area, but did not include drawings for any work on the premises. Outback and Cheeseburger approved the Landlord's Plans for the work that had been outlined.
 {¶ 18} Because Lofino did not include the work required for the remainder of the Landlord's Improvement Area, Outback and Cheeseburger concluded that Lofino would not complete the site work by the date required under the lease. Accordingly, Outback and Cheeseburger elected under Section 5.1(d) of the lease to complete the work themselves and deduct the amounts incurred, with interest, from tenant payments due under the lease.
 {¶ 19} Lofino's position was that it was only required to deliver the premises "as is," with the exception of the items shown on the drawings that had been submitted. As a result, Lofino notified Outback and Cheeseburger that it was electing its rights under Section 5.1(c) of the lease to terminate the lease, due to the parties' inability to agree on the Preliminary Plans for the Landlord's Work. Outback and Cheeseburger then filed this action for injunctive relief.
 {¶ 20} Lofino originally filed a petition for removal to U.S. District Court, but the case was later remanded to state court at the parties' request. Subsequently, a magistrate held a preliminary injunction hearing. Notably, Outback and Cheeseburger filed a motion in limine before the hearing, contending that the contract was unambiguous and that extrinsic evidence should not be allowed. Lofino did not oppose this motion, nor did it present any evidence at the hearing. Both sides argued to the magistrate that the leases were unambiguous, and that the lease terms supported the parties' respective positions.
 {¶ 21} The appellate file does not contain a transcript of the magistrate's hearing. However, Lofino's counsel admitted in the later hearing on the permanent injunction that both sides had told the magistrate that the contract was clear and unambiguous. In this regard, Lofino's counsel said that:
 {¶ 22} "When we argued the case in front of the Magistrate, I do want to address one thing Mr. Sullivan [Plaintiff's counsel] had to say. We both felt that the contract was clear and unambiguous, but in our respective parties' favor.
 {¶ 23} "My other argument, though, was that if it's not clear and unambiguous in my favor, that at least my position was reasonable, which then created an ambiguity." Transcript of Permanent Injunction Hearing, p. 9.
 {¶ 24} The magistrate issued a decision finding that Outback and Cheeseburger would likely succeed on the merits and would suffer irreparable harm if the contracts were terminated. In this regard, the magistrate found that the contracts unambiguously required Lofino to perform site work as envisioned by the site plan attached to the leases, and that Lofino had intentionally failed to include work for the premises required by the contract, including, parking areas, driveways and access roads (including all appropriate curb cuts and curbing), landscaping and irrigation, and lighting. Magistrate's decision, p. 3.
 {¶ 25} The magistrate, therefore, issued a preliminary injunction, stating that:
 {¶ 26} "Defendant is enjoined from terminating the contracts/leases during the pendency of this action; Defendant is enjoined from preventing Plaintiffs immediate access to their respective Premises to perform certain work pursuant to their respective contracts/leases, including, but not limited to, the site work included within the scope of Landlord's Work as defined by this Court; Plaintiffs are permitted according to the terms of the contracts/leases to perform Landlord's Work (site work) on the Premises; Defendant is enjoined from interfering with plaintiffs [sic] business relationships and contracts, including, but not limited to, Plaintiffs' business relationship with Van Etta [an engineering firm]." Id. at p. 4 (emphasis in original; parenthetical material added).
 {¶ 27} Lofino objected to the magistrate's decision, but the trial court rejected the objections. The trial court adopted and approved the magistrate's decision, and made it the order of the court.
 {¶ 28} In due course, a permanent injunction hearing was held. Because the court had indicated prior to the hearing that it would not consider extrinsic evidence, Lofino filed a written proffer of evidence. Outback and Cheeseburger responded with a written rebuttal. At the hearing, both sides presented legal arguments only. Among other things, Outback and Cheeseburger asked the court to require Lofino to cooperate to the extent necessary to obtain regulatory approvals. In particular, they mentioned that Lofino needed to join in the petition to the City of Beavercreek. Lof ino's counsel agreed that Outback and Cheeseburger could not do their work unless Lofino signed off as the property owner on various zoning issues with the County and the City of Beavercreek. However, Lofino's counsel wanted the court to let Lofino perform the site work, rather than having Outback and Cheeseburger perform the work themselves.
 {¶ 29} On December 6, 2005, the trial court filed a judgment entry granting a permanent injunction, as follows:
 {¶ 30} "This matter is before the Court upon the Plaintiffs complaint filed on February 3, 2005. Plaintiffs request for immediate access to the respective premises to perform the `Landlord's work,' as defined on page two of Plaintiff's brief filed on September 5, 2005, is SUSTAINED. The Plaintiff's request for a permanent order restraining and enjoining the Defendant from terminating the `Leases' also defined in Plaintiff's brief filed on September 5, 2005, is SUSTAINED. The Plaintiff's request for a permanent order restraining and enjoining the Defendant from interfering in any of Plaintiff's business relationships and/or contracts is SUSTAINED."
 {¶ 31} Lofino appealed from this decision on January 5, 2006. On March 1, 2006, with this appeal pending, Outback and Cheeseburger filed a motion for an emergency order and for an emergency hearing. The motion pointed out that Lofino had refused to sign a development application to the City of Beavercreek, and that the application had to be submitted by March 2, 2006, in order to be considered by the City at its April 5, 2006 meeting. According to the motion, the City had already informed Outback and Cheeseburger that it was not satisfied that the current court order was an acceptable substitute for Lofino's signature. The motion further noted that Lofino had never asked for a stay of the preliminary injunction pending appeal.
 {¶ 32} The same day, the trial court filed an emergency order restraining Lofino from further interference with Plaintiffs' efforts to carry out the court's December 6, 2005 judgment entry. In addition, the court ordered Lofino to sign the development application and said that if Lofino refused, the emergency order would act as a valid and legal substitute for Lofino's signature on the application.
 {¶ 33} On March 2, 2006, Lofino filed a motion for an immediate oral hearing and stay of the emergency order, but the trial court denied the request in an entry filed on March 6, 2006. The entry also found no just reason for additional delay in enforcing the March 1, 2006 order. Lofino filed a notice of appeal from both of these orders on March 30, 2006, and the appeals were subsequently consolidated.
 II {¶ 34} Lofino's First Assignment of Error is as follows:
 {¶ 35} "THE TRIAL COURT ERRED BY FAILING TO ENFORCE THE CLEAR AND UNAMBIGUOUS TERMINATION PROVISIONS OF THE PARTIES AGREEMENT."
 {¶ 36} Under this assignment of error, Lofino alleges that Section 5.1(c) clearly and unambiguously gives either party the option to terminate the lease if they cannot agree on the Landlord's Plans, regardless of which party is at fault in creating the disagreement. Lofino contends that the trial court wrongly ignored the termination option and created a situation in which the tenant can arbitrarily withhold approval of the landlord's plans and perform whatever work the tenant wishes, charging the work back to the landlord. Lofino further claims that the leases contemplate a chronological set of events, and that the "self-help" remedy in Section 5.1(d) relates only to a tenant's right to complete minor unfinished items in order to obtain a building certificate of occupancy. We disagree.
 {¶ 37} Section 5.1(c) states that "The Landlord's Plans shall include plans for all site work included in Landlord's Work" and that "The Landlord, at its sole cost and expense, shall prepare and submit the Landlord's Plans to Tenant within sixty (60) days from the Effective Date" of the lease. This section also provides that "If Landlord and Tenant are unable to agree on the Preliminary Plans on or before sixty (60) days after the Effective Date, then Tenant or Landlord shall have the option of terminating this Lease upon written notice to the other party whereupon this Lease shall be of no further force and effect."
 {¶ 38} Because the effective date of the leases was August 25, 2004, Lofino's plans should have been submitted to Outback and Cheeseburger by October 24, 2004. Lofino did not submit any plans by that date. Subsequently, on December 8, 2004, Outback and Cheeseburger sent Lofino written notice that it had failed to timely furnish plans. The notice additionally stated that:
 {¶ 39} "`Landlord's Plans' is defined to mean the written plans and specifications for all utilities to Tenant's proposed Building and all site work (including parking areas, driveways and access road, landscaping and lighting) included within that portion of the site plan designated as the `Landlord's Improvement Area.' (For your convenience, we have attached a copy of the relevant site plan depicting the Landlord's Improvement Area.) This Lease is very clear as to the area of the Shopping Center to be improved by the Landlord, and the scope of the work to be performed."
 {¶ 40} In response to this notice, Lofino sent plans, but did not include any site work on the leased premises. However, as we previously mentioned, site work is clearly included on the exhibits attached to the lease. Exhibit A-4 outlines the "Landlord's Improvement Area," and specifically includes the premises or sites for both proposed restaurants. This includes the parking lot and the entire premises, other than the actual pads on which the restaurants were to be located. After receiving the plans, Outback and Cheeseburger approved the plans, but also notified Lofino that they were electing the remedy in Section 5.1(d) to complete the Landlord's Work.
 {¶ 41} Lofino contends that the magistrate approved the "self-help" remedy in Section 5.1(d), based on the magistrate's incorrect assumption that Lofino would not complete the Landlord's Work. However, the magistrate's assumption was, in fact, correct. By failing to include plans for site work on the leased premises, Lofino clearly indicated that it did not intend to perform site work. Contrary to Lofino's contention, this was not a dispute about exactly what work was necessary to render the sites suitable for their intended use. Instead, Lofino refused to submit plans for any such work. Lofino apparently believed that no site work was necessary. However, if that were the case, the parties would not have included this part of the property in the Landlord's Improvement Area.
 {¶ 42} As we noted, Lofino also contends that Section 5.1(d) limits the "self-help" remedy to situations involving the landlord's failure to complete minor items. We disagree. The clear wording of the leases contradicts Lofino's position.
 {¶ 43} Section 5.1(d) begins by giving the tenant a right of termination where the landlord fails to obtain permits required for the "Landlord's Work" within 90 days after the lease's effective date. In the present case, that would have been November 23, 2004 — a time that had already expired before Lofino submitted its plans.
 {¶ 44} The second paragraph of Section 5.1(d) requires the landlord to substantially complete the Landlord's Work at a time no later than the dates provided in the lease. The leases encourage the landlord to complete its work and tender the premises within 90 days after the effective date of the leases, but give the landlord 120 days as the outside tender date. At that point, if the work has not been substantially completed, the tenant may terminate the lease. See Article I, Section 1.3(B). The outside tender date in the present case would have been December 23, 2004, which, again, was prior to the time that Lofino sent plans to Outback and Cheeseburger.
 {¶ 45} The second paragraph of Section 5.1(d) also defines "substantially complete" as "not withstanding the tenant's possession of the premises," "that: (a) the landlord's work has been completed, other than minor items that can be completed prior to completion of tenant's work without material interference with the tenant's activities; and (b) the appropriate governing agency has unconditionally issued a certificate of completion and/or certificate of inspection for the landlord's work."
 {¶ 46} The third paragraph of Section 5.1(d) requires the landlord to maintain liability insurance. And finally, paragraph four of Section 5.1(d) provides the "self-help" remedy for the tenant to complete the landlord's work "if it is not reasonably anticipated that landlord will complete the work by the dates herein provided, and tenant is (or will be) unable to obtain a building permit or certificate of occupancy pursuant to Tenant's construction schedule." By the time Lofino submitted its plans on January 6, 2005, the time for completion of the Landlord's Work had already elapsed, on December 23, 2004.
 {¶ 47} Notably, the paragraph on "self-help" does not restrict the remedy to Section 5.1(d), nor does it limit the remedy to situations where the landlord's work is "substantially complete." Instead, this paragraph says, in pertinent part, that "Notwithstanding anything contained in this lease to the contrary, if Landlord fails to completeany of Landlord's Work by the date(s) provided herein * * * Tenant shall have the right, but not the obligation, upon twenty-four (24) hour written notice to the Landlord, to complete Landlord's Work and deduct the amounts incurred." (Emphasis added).
 {¶ 48} Had the parties intended to restrict the remedy as Lofino suggests, they would have said that "If Landlord fails to substantially complete Landlord's Work by the date(s) provided herein * * * Tenant shall have the right * * * to complete Landlord's Work." However, the parties did not use such language. They used the broad phrase "any of Landlord's Work," and, therefore, did not confine the "self-help" remedy to minor items. The parties also intended this provision to control over all others, by using the phrase "notwithstanding anything contained in this Lease to the contrary." Accordingly, the trial court did not err in refusing to apply the termination provisions in the leases.
 {¶ 49} Lofino's First Assignment of Error is overruled.
 III {¶ 50} Lofino's Second Assignment of Error is as follows:
 {¶ 51} "THE TRIAL COURT ERRED BY MISINTERPRETING THE MEANING OF THE CONTRACT TERM THE LANDLORD'S WORK.'"
 {¶ 52} In discussing this assignment of error, Lofino relies on conflicting assertions. First, Lofino contends that its interpretation of the leases is clear and unambiguous. Lofino then states that because its interpretation is reasonable, the trial court should have recognized, at a minimum, that the leases were ambiguous. However, language cannot be clear and ambiguous at the same time.
 {¶ 53} "When the language of a written agreement is clear, a court may look no further than the writing itself to find the intent of the parties. * * * As a matter of law, a contract is unambiguous if it can be given a definite legal meaning. * * * It is generally the role of the trier of fact to decide whether ambiguity is present in a written agreement." W.K. v. Farrell, 167 Ohio App.3d 14, 22, 2006-Ohio-2676,853 N.E.2d 728, at ¶ 36 (citations omitted). An appellate court's review of contact interpretation and construction is de novo, because questions of law are involved. Joel Lehmkuhl Excavating v. City of Troy, Miami App. No. 2004-CA-31, 2005-Ohio-2019, at ¶ 29. We do give deference on appeal to the trial court's factual findings, if competent evidence exists to support the findings. Id.
 {¶ 54} Lofino's interpretation of the leases is that Section 5.1(b) of the leases requires the landlord to perform only those improvements and infrastructure in the Landlord's Improvement Area that are "necessary" to allow the tenants to obtain permits and approvals for construction of the restaurant buildings. Based on this interpretation, Lofino contends that the trial court ignored the word "necessary" and incorrectly required Lofino to perform all improvements and infrastructure within the improvement area. Again, we disagree.
 {¶ 55} Section 5.1(b) states that the landlord is to construct:
 {¶ 56} "[A]ll necessary improvements and infrastructure for the Shopping Center located within that area designated on the Site Plan as `Landlord's Improvement Area' or any other work which is necessary to allow Tenant to obtain permits and approvals for construction of Tenant's intended improvements, and upon completion of those improvements to obtain a Certificate of Occupancy therefore, including without limitation, the parking areas, driveways and access roads (including all appropriate curb cuts and curbing), landscaping and irrigation, and lighting."
 {¶ 57} Lofino's interpretation ignores the language in the last part of this paragraph, which indicates the parties' intent as to the necessary improvements. The magistrate relied on this language to find that the parties intended to include the parking areas, driveways and access roads, (including all appropriate curb cuts and curbing), landscaping and irrigation, and lighting as part of the infrastructure that Lofino was required to provide. We agree with the magistrate.
 {¶ 58} Lofino's interpretation is inconsistent with the clear intent of the wording of Section 5.1(b). Lofino's interpretation is also inconsistent with Section 5.3, which outlines the "Tenant's Work." At no point in the discussion of the "Tenant's Work" is there any reference to items like parking lots, driveways, access roads, curb cuts, irrigation, etc. In addition, Section 5.2 of the leases provides the landlord with a substantial sum ($200,000 total) as reimbursement for the "Landlord's Work." This is a sum above and beyond the rent payments.
 {¶ 59} Lofino also contends that the leases were ambiguous and that extrinsic evidence should have been considered. Lofino did not, however, attempt to present any extrinsic evidence at the preliminary injunction hearing. We agree with the trial court that extrinsic evidence was not allowed. The law is clear that "`absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'"Galmish v. Cicchini, 90 Ohio St.3d 22, 27, 2000-Ohio-7, 734 N.E.2d 782
(citation omitted). In Galmish, the Ohio Supreme Court stressed that the point is not "`how the agreement is to be proved, because as a matter of law the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, oral or written, are excluded; or, as it is sometimes said, the written memorial supersedes these prior or contemporaneous negotiations.'" Id., quoting from In re Gaines' Estate (1940),15 Cal.2d 255, 264-265, 100 P.2d 1055, 1060.
 {¶ 60} Because the lease agreements were not ambiguous, the trial court correctly excluded extrinsic evidence about negotiations. The trial court also did not err in interpreting the agreements. Accordingly, Lofino's Second Assignment of Error is overruled.
 IV {¶ 61} Lofino's Third Assignment of Error is as follows:
 {¶ 62} "THE TRIAL COURT ERRED IN GRANTING EQUITABLE RELIEF AND IN FAILING TO COMPLY WITH OHIO CIVIL RULE 65 REGARDING THE ISSUANCE OF THE INJUNCTION AND OHIO CIVIL RULE 60(B) REGARDING THE MODIFICATION OF THE INJUNCTION."
 {¶ 63} Lofino's first contention in support of this assignment of error is that the trial court erred in granting equitable relief because money damages would have been an adequate remedy. In the alternative, Lofino contends that the trial court should have granted specific performance by allowing Lofino to perform its own work, as directed by the trial court.
 {¶ 64} In Sholiton Industries, Inc. v. Wright State University (Sept. 20, 1996), Greene App. No. 95-CA-101, 1996 WL 531587, *1, we held that real estate interests are unique, and that "specific performance is an appropriate equitable remedy for the breach of a commercial lease, even without further evidence that there is no adequate remedy at law." In explaining these conclusions, we noted that the "effect of location on retail trade is notoriously difficult to project. That is consistent with the legal principle that an interest in land is unique; different locations are not interchangeable." Id. at *5.
 {¶ 65} Because Outback and Cheeseburger possessed unique interests in the real estate, the trial court was justified in awarding equitable relief. Moreover, the trial court did not err in refusing to let Lofino perform the work. Section 5.1(d) gave the tenant the option of doing the landlord's work and deducting the cost from future rent payments. The landlord, having refused to perform, no longer had this option.
 {¶ 66} The second branch of Lofino's argument involves alleged procedural deficiencies in the order granting the permanent injunction and in the process used to amend the order. Civ. R. 65(D) provides that:
 {¶ 67} "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise."
 {¶ 68} Civ. R. 65(D) requires "specificity, not perfection." MeadCorp. v. Lane (1988), 54 Ohio App.3d 59, 560 N.E.2d 1319. The purpose of specificity is to allow defendants to comply "without fear of unwitting violation." Id. at 67. However, Civ. R. 65(D) does not state that injunctions will be inoperative in the absence of compliance, and appellate courts will disregard any error that is not prejudicial.North Elec. Co. v. United Steelworkers of America (1971),28 Ohio App.2d 253, 259-260, 277 N.E.2d 59.
 {¶ 69} In the present case, the preliminary injunction order issued by the magistrate and trial court was quite specific in informing Lofino of what acts were restrained. The order also did not refer to the complaint or other documents. Notably, nothing changed between the time this order was issued and when the permanent injunction order was filed on December 6, 2005.
 {¶ 70} We agree with Lofino that the trial court should not have referred to other documents when it issued the permanent injunction order. The order was also somewhat broad, in terms of restraining Lofino from interfering with any business relationships. However, the parties were well aware of what acts were being restrained. For example, the permanent injunction order gave Outback and Cheeseburger immediate access to the respective premises to perform the "Landlord's Work" as "defined on page two of the Plaintiffs brief filed on September 5, 2005." Reference to the September 5, 2005 brief reveals that the definition was taken directly from the definition of "Landlord's Work" in Section 5.1 of the leases. Therefore, there would have been no confusion about the terms of the permanent injunction. More importantly, Lofino has failed to specify how it was prejudiced by the December 6, 2005 order granting a permanent injunction. Therefore, we conclude that this error was harmless.
 {¶ 71} Similarly, Lofino has not alleged prejudice as a result of the emergency order that was granted on March 1, 2006. Nonetheless, we are required to vacate the order. The trial court did not state the basis for the emergency order, but Lofino claims the order should be evaluated under Civ. R. 60(B), which allows the court to grant relief from judgment where a party alleges grounds like mistake, surprise, or excusable neglect. Our interpretation, however, is that the emergency order was an attempt under Civ. R. 60(A) to correct an error arising from oversight or omission.
 {¶ 72} In the emergency order, the trial court directed Lofino to sign a development application with the City of Beavercreek, and stated that the order would serve as a valid substitute for the signature if Lofino refused to sign. Significantly, the signature issue had been previously considered at the permanent injunction hearing on September 12, 2005. During the hearing, the parties discussed the fact that Lofino's signature was required on petitions that would be filed with the City of Beavercreek. When the trial court subsequently issued the permanent injunction giving Outback and Cheeseburger access to the premises to do the Landlord's Work, and prohibiting Lofino from interfering in any of their business relationships or contracts, the court likely assumed that this was sufficient to require Lofino to do what had already been discussed. Unfortunately, the trial court did not specifically say so in the permanent injunction order, and the City of Beavercreek refused to accept the development application without further assurances.
 {¶ 73} Outback and Cheeseburger could have filed a contempt action, given the fact that the parties and the court had already specifically discussed this matter. Rather than doing so, Outback and Cheeseburger attempted to rectify the court's omission by filing a motion with the trial court. However, by that time Lofino had already appealed. In such situations, Civ. R. 60(A) provides that:
 {¶ 74} "Clerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time on its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter while the appeal is pending may be so corrected with leave of the appellate court."
 {¶ 75} The notice of appeal and docket statement were filed on January 5, 2006, and the transcript of proceedings and App. R. 11(B) notification were filed on February 22, 2006. Despite the fact that the appeal had been docketed, Outback and Cheeseburger failed to ask this court for leave to correct the mistake in the permanent injunction order.
 {¶ 76} We have held that failure to ask for leave is fatal. SeeMannix v. DCB Service, Inc., Montgomery App. No. 19910, 2004-Ohio-6672, at ¶ 13. Therefore, the third assignment of error is sustained in part, but only with regard to the March 1, 2006 emergency order and the March 6, 2006 order denying Lofino's request for an oral hearing on the emergency motion. These orders are vacated, even though the issue is likely moot. Specifically, we assume that the development application was submitted to the City of Beavercreek on March 2, 2006, and that construction of the restaurants has already begun. These matters are not of record, however, and the case will be remanded to the trial court for further proceedings.
 {¶ 77} Based on the preceding discussion, Lofino's Third Assignment of Error is overruled in part and sustained in part.
 V {¶ 78} All of Lofino's assignments of error having been overruled insofar as they relate to the permanent injunction issued on December 6, 2005, that judgment is Affirmed. The permanent injunction order is the subject of Appellate Case No. 06-CA-2.
 {¶ 79} Lofino's Third Assignment of Error having been sustained insofar as it relates to the emergency order of March 2, 2006, and the order of March 6, 2006 (denying Lofino's motion for an oral hearing on the emergency order), those orders are Reversed. The emergency order and the order denying the motion for an oral hearing are the subject of Appellate Case No. 06-CA-44. This cause is Remanded for further proceedings consistent with this opinion.
BROGAN and DONOVAN, JJ., concur.