PHOENIX CONCRETE, INC. et al., Appellants,

v.

RESERVE–CREEKWAY, INC., Appellee.

[Cite as *Phoenix Concrete, Inc. v. Reserve–Creekway, Inc.* (1995), 100 Ohio App.3d 397.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 94APE05–770.

Decided Jan. 24, 1995.

398

*Lane, Alton & Horst, Rick E. Marsh, Patrick H. Boggs* and *Cynthia Sands,* for appellants.

*Kaufman & Cumberland, William W. Jacobs* and *Laura Hauser Pfahl,* for appellee.

WHITESIDE, Presiding Judge.

Plaintiffs-appellants, Phoenix Concrete, Inc. ("plaintiff" or "Phoenix Concrete"), and Creekway Development Company ("plaintiff" or "Creekway Development"),

appeal from a judgment of the Franklin County Court of Common Pleas and raise the following two assignments of error:

1. "The trial court erred when it refused to reform the deed to reflect an eighty (80) foot ingress/egress easement over appellee Reserve–Creekway, Inc.'s Property."

2. "The trial court erred when it did not grant to appellants Phoenix Concrete, Inc. and Creekway Development Company an easement by estoppel."

On August 10, 1990, Creekway Development Company granted to defendant[1] an option to lease or purchase 22.316 acres at the "Creekway Business Park." After the option was executed, the parties discussed the availability for purchase of the two adjacent lots. On October 8, 1990, Creekway Development and Reserve Ventures I executed a lease for the three lots. The lease contained an option to purchase. Creekway Development entered a contract to construct a building for Reserve International Services, Inc. on the leased property.

Creekway Development granted an exclusive water-line easement (thirty feet) to the city of Columbus along the eastern border of the lots within the eighty-foot area, which plaintiffs claim is the ingress/egress easement. The easement was recorded on March 14, 1991.

On March 22, 1991, Reserve–Creekway, Inc. ("defendant" or "Reserve–Creekway") gave notice to Creekway Development that it was exercising Reserve Ventures I's option to purchase the land. On March 29, 1991, Reserve Ventures I assigned its interest in the lease to Reserve–Creekway. Also on that day, Creekway Development transferred the real property by general warranty deed to defendant. On July 22, 1991, Phoenix Concrete acquired property from Creekway Development in a like-kind exchange, including property located south of the Creekway Business Park. In either late 1991 or early 1992, Phoenix Concrete arranged to have a driveway paved, which was located on the eastern portion of defendant's property running south from Creekway Drive to Phoenix Concrete's property within the area which Phoenix Concrete claims is the easement.

Phoenix Concrete believes it has easement rights to the property on which the driveway is located. However, no document which specified the easement as a means of ingress/egress was recorded. Defendant contends that Phoenix Concrete does not have easement rights over its property.

---

1. The option was entered into by Reserve International Services, Inc. Reserve–Creekway, Reserve International Services, Inc., Reserve Ventures I, and Reserve Ventures II are corporations in which the same person is the sole shareholder.

In August 1993, Phoenix Concrete commenced this action, seeking reformation of the deed to include an easement and a temporary restraining order, and preliminary and permanent injunctive relief to enforce an easement. The trial court granted the preliminary injunction. Defendant filed its answer and a counterclaim against Phoenix Concrete and a third-party complaint against Creekway Development. Subsequently, Phoenix Concrete filed an amended complaint including Creekway Development as a party-plaintiff as well.

The parties filed stipulated facts and stipulated exhibits and agreed to submit the case to the trial court on the stipulated facts and exhibits, depositions, and written briefs. The trial court found in favor of defendant on plaintiffs' claims and in favor of plaintiffs on defendant's claims. Plaintiffs filed a motion for reconsideration, which was overruled. The trial court then filed a *nunc pro tunc* entry journalizing its original decision and its decision overruling plaintiffs' motion for reconsideration.

By the first assignment of error, plaintiffs contend that the trial court erred when it refused to reform the deed to reflect an ingress/egress easement over defendant's property. Plaintiffs contend that the judgment is against the manifest weight of the evidence and that the trial court applied the wrong legal standard.

R.C. 2719.01 provides for the correction of defects in instruments as follows:

"When there is an omission, defect, or error in an instrument in writing or in a proceeding by reason of the inadvertence of an officer, or of a party, person, or body corporate, so that it is not in strict conformity with the laws of this state, the courts of this state may give full effect to such instrument or proceeding, according to the true, manifest intention of the parties thereto."

Reformation "is an equitable remedy whereby a court modifies the instrument which, due to mutual mistake on the part of the original parties to the instrument, does not evince the actual intention of those parties." *Mason v. Swartz* (1991), 76 Ohio App.3d 43, 50, 600 N.E.2d 1121, 1125, citing *Greenfield v. Aetna Cas. & Sur. Co.* (1944), 75 Ohio App. 122, 128, 30 O.O. 427, 429–430, 61 N.E.2d 226, 229, "The purpose of reformation is to cause an instrument to express the intent of the parties as to the contents thereof * * *." *Delfino v. Paul Davies Chevrolet, Inc.* (1965), 2 Ohio St.2d 282, 286, 31 O.O.2d 557, 559, 209 N.E.2d 194, 197, citing 47 Ohio Jurisprudence 2d 120, Reformation of Instruments, Section 2. In order to reform an instrument, clear and convincing proof must show that the parties made a mutual mistake. *Stewart v. Gordon* (1899), 60 Ohio St. 170, 53 N.E. 797; *Mason, supra*, at 50, 600 N.E.2d at 1125–1126; *Castle v. Daniels* (1984), 16 Ohio App.3d 209, 212–213, 16 OBR 224, 227–229, 475 N.E.2d 149, 152–154.

Plaintiffs argue that defendant expressly agreed to grant an ingress/egress easement as part of the agreement to lease/purchase the property and that plaintiffs are entitled to reformation of the deed because the parties made a mutual mistake in believing that the easement was recorded, making specific reference thereto in the deed unnecessary. Defendant contends that, although the parties discussed an ingress/egress easement before the lease was executed, no document was filed which designated an ingress/egress easement. However, if there were a recorded easement, reformation would be unnecessary.

Creekway Development executed a general warranty deed to defendant. The option-exercise letter states as follows:

"2. *Conveyance.* Seller shall convey fee simple marketable title to the property by general warranty deed in form acceptable to R–C [Reserve–Creekway] *free and clear of all liens, claims, and encumbrances* whatsoever except: (a) *easements,* conditions, restrictions, and *limitations of record* which are acceptable to R–C [Reserve–Creekway]. * * * *The lease shall terminate upon filing the deed for record.*" (Emphasis added.)

Defendant argues that the option-exercise letter set forth that it would purchase the property subject only to the easements of record and, since no ingress/egress easement was recorded and the lease terminated upon the filing of the deed, no ingress/egress easement exists.

The trial court found that, although the parties discussed the easement, since no ingress/egress easement was recorded, the parties must not have reached an agreement. This conclusion is inconsistent with the doctrine of reformation, which can be applied only where there is no recorded document, but that which is in writing or recorded fails to reflect the intent of the parties. The trial court stated as follows:

"The Court confirms that neither the deed nor the Lease which included Exhibit A contained a description of an ingress/egress easement over Defendant's property which would bind Defendant. No separate document of an easement grant has been presented. Additionally, a Seller's Affidavit specifically disclaims any encumbrances not of record. Therefore, the Court must determine if the parties expressed their actual intent in any other written agreement which would permit the Court to reform the deed to remedy an 'omission, defect or error' in executing the deed, pursuant to R.C. § 2719. [*sic*].

"After a thorough reading of the parties' briefs, stipulated exhibits, and depositions, it is apparent to the Court that the parties did, in fact, discuss driveway access over Reserve's property. This is evidenced by the many exhibits on which the parties had hand drawn various roadway configurations and from the depositions of the participants. However, the exhibits do not show that the

ingress/egress easement was identically drawn on every exhibit, nor is it possible to say what width was intended on every exhibit. On several exhibits, the driveway is shown going both north and south of Creekway Drive, but on at least one the driveway is shown going north, only. One exhibit features the words 'Proposed Roadway' along the eastern border, as if no firm agreement had been reached as to some or all of the details."

It is clear that the parties contemplated an ingress/egress easement over defendant's property when they were preparing to enter the lease with the option to purchase. The lease document states: "Lessee takes the premises subject to utility and driveway easements as shown on Exhibit A." Exhibit A has the disputed area marked with a dotted line; although its designation is illegible, it is not marked as "ingress/egress easement." The owner of Phoenix Concrete testified and stated:

"Q. Not only is it not clear which directions they run or exactly where they exist, but none of them are specifically or clearly labeled as to what type of easements they might be?

"A. Right."

Even though the lease states that a driveway easement exists, it does not identify any of the easements as such. However, through the lease, the parties had an agreement as to the existence of the ingress/egress easement. The exhibits show drawings which were identified in depositions as a proposed roadway over defendant's property. Additionally, defendant's chief operating officer during that time period testified that his role in the interactions which led to the lease "was basically to obtain the property, negotiate all sale, lease documents on behalf of Reserve International Services and close everything up." The chief operating officer admitted many times in his testimony that defendant was granting an easement to plaintiff. For example, he stated:

" * * * And at that time we had some question marks whether we wanted to lease those additional two parcels knowing that we would be subject to that easement and have to give up, if I remember correctly, the figure was like 30 feet of property to allow them to do that.

"There was much discussion, and basically Ian Abrams was very strongly in favor of the property is available [*sic* ], let's use the property, 30 feet wasn't going to make a hell of a big difference, let's go ahead and lease that additional property subject to that easement."

Again, he stated:

"Well, the agreement was that we provided them with that roadway as part of Lots 12 or 14, whatever that was to allow them to get access into the Williams Road area, the rest of their development. That was one of the limitations that we

saw in adding Lots 12 and 14 originally because we knew we were not going to be able to use the whole piece of property. But from our perspective, it was better to have the additional four acres and provide the easement as opposed to not having the four acres."

The evidence does indicate that the parties agreed before entering into the lease that plaintiffs would have access over defendant's land.

Defendant's chief operating officer also testified that, after entering into the lease, the parties discussed only purchase price because the other details had been agreed upon at the time of entering the lease. He stated as follows:

"Q. With regard to the purchase of the property, were there continuing discussions concerning the driveway and what the ultimate final written easement would be over any egress and ingress driveway?

"A. No. The only thing that I remember from during that time—You know, once the lease was done, that was basically it until we actually got to the negotiation of the purchase. And the only thing that was really discussed at the purchase was the purchase price and nothing else. We were taking everything else exactly how we leased it. * * *"

The access granted over defendant's land is an easement, not a revokable license as defendant contends. Defendant's chief operating officer, who was in charge of obtaining this property, admitted that defendant granted plaintiffs an easement. Additionally, defendant consented to plaintiff's paving a road/driveway within this easement. Defendant's chief operating officer testified that:

"[T]here was an understanding that yes, we had provided them the ability to do that and that's why we backed our fence off 30 feet.

"Q. I understand the discussions. I'm asking was there ever a written agreement that allowed them to do it [build the road/driveway] that you saw?

"A. My understanding was that the lease provided that written agreement. Now, reading it at this point specifically about that subject, you can see that it's not included as far as in writing. But my understanding of it was that's what we had provided them. * * *"

Defendant erected a fence and positioned it around the easement. The chief operating officer testified at his deposition:

"The only thing I remember specifically regarding that is when we were in the development process sometime after the signing of the lease, when we were setting the fence line, we specifically set the fence line on, again, the front end of our property back from where the actual property line was in order to leave room for the roadway going over to Williams Road."

He continued at his deposition, "[t]he understanding was there was a 30–foot setback required for the fence on both sides."

Moreover, plaintiffs contend that defendant agreed to permit plaintiffs to move defendant's fence because it encroached upon the easement and needed to be moved in order to pave the access drive. The chief financial officer of Phoenix Concrete testified that, at the time that the driveway was paved, Phoenix Concrete relocated defendant's fence to accommodate portions of the driveway. She stated that she was present when a discussion was held with one of defendant's vice-presidents who agreed to allow Phoenix Concrete to move the fence.[2] Additionally, she stated that Phoenix Concrete used this road for two years before defendant objected to the use.

Moreover, on October 17, 1990, an eighty-foot utility easement was dedicated to public use in the disputed area.[3] The city of Columbus was granted a thirty-foot easement on March 14, 1991 within this disputed area. When the easement was recorded, an exhibit was attached that designated the water-line easement as thirty feet, located with fifty feet between the eastern edge of the easement and the eastern border of the lot. Therefore, eighty feet in total is identified with dotted lines, which implies an eighty-foot easement in total. Additionally, the water-line easement makes an exception for utility service lines and "paved roadway/parking areas."

Plaintiffs have demonstrated by clear and convincing evidence that the parties intended there to be an ingress/egress easement within this area, but the exact area of the easement is not clear. Defendant's chief operating officer admitted that defendant granted plaintiffs a thirty-foot easement. However, a partner of Creekway Development testified that his understanding of the easements was "the larger easements north and south of Creekway Drive would be the ingress and egress easements that were established as the site for Reserve had grown." Additionally, he stated that:

"There was an assumption that the—I would make the assumption that this 80–foot–wide easement was for driveway purposes.

"Q. Did anyone tell you that this 80–foot line on this page was for a driveway-easement purpose?

"A. Yes."

Additionally, the surveyor testified that a thirty-foot easement for the water line had been granted to the city of Columbus within that eighty-foot area.

---

2. The vice-president died in 1992.

3. The plat was approved and accepted by city council on December 2, 1990.

Therefore, there is a dispute over the size of this easement—it is either thirty, fifty or eighty feet wide.

Even though the size of the easement is in question, there was an agreement for an easement, and the trial court should determine the area of the easement from the evidence. *Columbia Gas Transm. Corp. v. Bennett* (1990), 71 Ohio App.3d 307, 594 N.E.2d 1. In *Columbia Gas,* an erroneous section designation in the instrument caused the instrument to be recorded outside the chain of title; therefore, the purchaser did not have constructive knowledge of the easement. However, the court stated that, had an enforceable easement existed, the scope of the easement could be determined by the court by looking to other circumstances other than the specific delineation in the instrument. That court stated:

" * * * For example, where an instrument is silent on the width and depth to be given a gas pipeline easement, a court may define its scope by what is reasonably necessary and convenient to accomplish the purpose for which the easement was granted." *Columbia Gas* at 318, 594 N.E.2d at 8, citing *Roebuck v. Columbia Gas Transm. Corp.* (1977), 57 Ohio App.2d 217, 11 O.O.3d 256, 386 N.E.2d 1363, and *Rueckel v. Texas E. Transm. Corp.* (1981), 3 Ohio App.3d 153, 3 OBR 172, 444 N.E.2d 77.

Therefore, the trial court in this case may look to the other circumstances to define the scope of the easement by what is "reasonably necessary and convenient" to accomplish the ingress/egress purpose.

 Defendant contends that an oral agreement to create the easement is unenforceable under the Statute of Frauds, R.C. 1335.04, which provides as follows:

"No lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it, or his agent thereunto lawfully authorized, by writing, or by act and operation of law."

However, acts performed in part performance of verbal contracts may operate to take them out of the statute and thereby make them enforceable. *Myers v. Croswell* (1888), 45 Ohio St. 543, 547, 15 N.E. 866, 868–869. In this case, plaintiffs paved a road/driveway over the easement and have been using it, and defendant moved its fence to accommodate the drive. This part performance is sufficient to take the oral agreement out of the operation of the Statute of Frauds even if it be applicable. However, the Statute of Frauds does not preclude reformation of a written agreement which as a result of a mutual mistake fails to reflect the intent of the parties.

Therefore, as a matter of law, plaintiffs have an easement of at least thirty feet over defendant's property, since defendant's chief operating officer admitted that

the parties intended a thirty-foot easement to exist. It is clear that the parties made a mutual mistake in thinking that the easement was recorded making specific reference thereto in the deed unnecessary. That would be the case if the easement was on recorded plat, since the deed reference to easements of record would be sufficient. Since the parties mistakenly believed the deed preserved plaintiffs' access easement rights, the deed should be reformed so to indicate. Consequently, plaintiffs' first assignment of error is well taken to the extent that the court refused to reform the deed to reflect an easement.

By the second assignment of error, plaintiffs contend that the trial court erred when it did not grant to plaintiffs an easement by estoppel. By our ruling on the first assignment of error, we determined that the parties intended plaintiffs to have an access easement but mistakenly believed it had been otherwise expressly granted; therefore, this assignment of error is moot.

For the foregoing reasons, the first assignment of error is sustained to the extent that the court erred in failing to reform the deed to reflect the reserved access easement, and the second assignment of error is moot; the judgment of the Franklin County Court of Common Pleas is reversed, and this cause is remanded to that court for determination of the scope of the easement and such further proceedings as may be in accordance with law and consistent with this opinion. Costs are assessed against defendant.

*Judgment reversed
and cause remanded.*

BOWMAN and TYACK, JJ., concur.