OPINION
{¶ 1} The appellants, certain homeowners' associations, appeal from a judgment awarding damages against them in an action for breach of contract. For the reasons set forth below, the judgment is affirmed in part and reversed in part. *Page 2 
 I {¶ 2} This appeal involves a dispute regarding recreational facilities located on property owned by Connor Murphy, Ltd. (hereinafter Connor) in Fairfield, Butler County, Ohio. The recreational facilities were developed in 1973 by Wildwood Management, Inc. (hereinafter Wildwood, in contradistinction to Wildwood Recreational Facilities, LLC), a wholly-owned subsidiary of Towne Properties Inc. (hereinafter Towne), on a portion of a 300-acre parcel of land. The recreational facilities consisted of two buildings available for social events and meetings which the parties refer to as "The Manor House" and "The Lodge." The facilities also include a swimming pool, tennis courts, and a practice tennis court.
 {¶ 3} Numerous housing units were also constructed on other portions of the acreage.
 {¶ 4} Of relevance to this appeal, the property is home to numerous condominium units, which were eventually grouped into seven separate condominium associations: Applewood Village Homeowners' Association, Inc. (hereinafter Applewood), Bluffs of Wildwood Homeowners' Association, Inc. (hereinafter Bluffs), Meadow of Wildwood Condominium Association, Inc. (hereinafter Meadow), Quail Meadows Condominium Owners' Association, Inc. (Quail Meadows), Twin Lakes Homeowners' Association (Twin Lakes), Wellington Green Condominium Unit Owners' Association (Wellington), and Pepperridge of Wildwood Condominium Owners' Association (Pepperridge).[1]
 {¶ 5} Following the formation of each condominium association, Wildwood and the particular Association executed a document entitled "Easement Agreement," which granted to the individual residents of the specific Association the right to utilize the *Page 3 
recreation facilities owned by Wildwood in exchange for a fee.[2]
These "easements" were duly recorded in the Butler County Recorder's Office.
 {¶ 6} Eventually, Wildwood conveyed the facilities to another Towne subsidiary, Wildwood Recreational Facilities, LLC (hereinafter Wildwood Recreational). In 1991, Wildwood Recreational and the Associations entered into an "Agreement to Modify Deeds of Easement."[3] The Agreement provided for the use of the recreational facilities by the individual residence owners in each Association in exchange for the payment of a $15 monthly fee per residence. The Agreement was recorded in the property records on February 4, 1992. The 1991 Agreement provided, in part, that its provisions would "bind" the parties for a period of ten years "from the date on which this Agreement is recorded in the Recorder's Offices of Butler County, Ohio." It further provided that it would "automatically renewed [sic] for successive ten (10) year periods unless amended or terminated by the parties."
 {¶ 7} In 1996, Meadow and Wildwood Recreational entered into an "Easement Agreement," which permitted the individual residents of Meadow to utilize the recreation facilities in exchange for a monthly fee. This Easement Agreement had a time limit of 30 years, and provided for renewal "forever for successive periods of 10 years each, unless earlier terminated by both parties."
 {¶ 8} In 2000, the Associations approached Wildwood Recreational regarding their desire to modify the terms of the 1991 Agreement. The parties conducted negotiations throughout 2001 into 2002; however, no amendment was ever executed, and the 1991 Agreement extended, by default, for another ten-year period beginning in *Page 4 
February, 2002. That same month, Pepperridge stopped paying the monthly user fee.
 {¶ 9} On April 12, 2002, Wildwood Recreational notified the Associations that Connor intended to purchase the recreation facility property for the sum of $700,000. Shortly thereafter, the remaining Associations, except for Quail Meadows, ceased paying their user fees. Quail Meadows stopped payments in July 2002. Connor closed on the property on July 31, 2002.
 {¶ 10} Following unsuccessful attempts to collect the fees due it, Connor commenced litigation in the Butler County Common Pleas Court. The Associations filed an answer and counterclaim in which they alleged that the 1991 Agreement was invalid. The parties conducted extensive discovery. During the course of the litigation the parties filed more than ten separate motions for summary judgment regarding various issues.
 {¶ 11} A bench trial was commenced on March 19, 2007 and concluded on March 29, 2007, following which the trial court found in favor of Connor. Damages were assessed in the following amounts: Applewood — $208,508; Bluffs — $61,267.78; Meadow — $59,291.40; Pepperridge — $126,488.32; Quail Meadows — $91,901.67; Twin Lakes — $127,476.51; and Wellington — $27,669.32. Connor was also awarded pre-judgment and post-judgment interest against all the Associations. The trial court also enjoined the Associations from "refusing to pay future assessments as they become due under the [1991 Agreement]."
 {¶ 12} From the judgment of the trial court, the Associations appeal.[4]
 II {¶ 13} The first assignment of error raised by the Associations states as follows: *Page 5 
 {¶ 14} "THE TRIAL COURT ERRED IN FINDING THE MEADOW OF WILDWOOD LIABLE PURSUANT TO PLAINTIFF'S EXHIBIT 18 (DEFENDANTS B) AND PEPPER RIDGE LIABLE WITHOUT AN UNDERLYING EASEMENT."
 {¶ 15} This assignment of error sets forth two separate arguments. First, Meadow contends that the trial court erred by concluding that the 1996 Easement Agreement was valid. In support, Meadow argues that the owner of the recreational facility was improperly identified, thereby rendering the instrument invalid. Second, Pepperridge contends that the trial court erred by finding it subject to the terms of the 1991 Agreement. Pepperridge argues that it cannot be held responsible under the 1991 Agreement, because it was not a party to any easement purported to be modified by the Agreement.
 {¶ 16} We turn first to the claim that the 1996 Easement Agreement is invalid. Meadow is correct in its assertion that the document improperly identified the Grantor as Wildwood Properties, Inc., when in fact, the owner of the recreational facilities at the time that particular contract was executed was Wildwood Management, Inc.[5] The trial court found that the Agreement was valid, and that the misnomer in the Grantor's name could be corrected by reformation. Meadow now argues that this error could not be cured by reformation. Meadow further argues that even if the error could be corrected, any action for reformation is barred by the applicable statute of limitations.
 {¶ 17} "Reformation of an instrument is an equitable remedy whereby a court modifies the instrument which, due to mutual mistake on the part of the original parties to the instrument does not reflect the actual agreement or intention of the parties." 13A Ohio Jurisprudence 3d (2006) 145, Cancellation and Reformation of Instruments, *Page 6 
Section 64. "The function of reformation is to make a writing express the agreement which the parties themselves have intended." Id. Section 65. "Courts of equity will, by reformation of an instrument, correct mistakes in the names of the parties and of other persons mentioned in the instrument * * *." Id. Section 73. Further, the reformation of instruments is permissible "not only as between the original parties, but, also, as to the parties in privity with them, such as successors in interest * * *." Id. Section 87. This inherent equitable power is also recognized by the Ohio General Assembly which has stated that courts may give "full effect" to a defective instrument that is "not in strict conformity with the laws [of Ohio]," so as to give effect to the intent of the parties. R.C. 2719.01. "In order to reform an instrument, clear and convincing proof must show that the parties made a mutual mistake."Phoenix Concrete, Inc. v. Reserve-Creekway, Inc. (1995),100 Ohio App.3d 397, 400.
 {¶ 18} In this case, the only claimed mistake in the 1996 Agreement involves the name of the Grantor, which was misidentified as Wildwood Properties, Inc. It is clear that Meadow and the owner of the recreational facilities intended to enter into an agreement for the use of the facilities in exchange for a fee. There is no evidence that the 1996 Agreement was fraudulently induced. Likewise, there is no evidence, or claim by Meadow, that there was no meeting of the minds with regard to the terms of the contract. In short, there is clear and convincing evidence that the parties intended to enter into this contract, and that its terms were agreed to by Meadow. Although the name of a different Towne subsidiary, which was a prior owner of the facility, was mistakenly inserted into the Agreement, the evidence shows that Meadow adhered to the terms of the contract for a period of six years, and that it did not take any action to cancel or rescind the contract during that time. Indeed, Meadow did not stop making payments under the Agreement until it was given notice of the sale to Connor. *Page 7 
 {¶ 19} This is the situation contemplated by the equitable remedy of reformation. Nothing in the contract changes except that the proper subsidiary name is inserted. Otherwise, all terms that were mutually agreed to by the parties remain the same. Thus, we agree with the trial court's decision that this mistake is capable of being cured via reformation.
 {¶ 20} We next address Meadow's claim that the time for reformation has run under the applicable statute of limitations. "R.C. 2305.14
provides that actions not specifically limited in any provision of the Code must be brought within ten years after the cause accrued. A cause of action for reformation of a written instrument based upon mistake accrues upon the execution of the instrument." Bonham v. Hamilton, Butler App. No. CA2006-02-030, 2007-Ohio-349, ¶ 31, citations omitted.
 {¶ 21} Wildwood Recreational and Connor did fail to bring an action for reformation within the relevant statute of limitations. Instead, they filed an action for damages resulting from a breach of the 1996 contract. However, both the issues of reformation and rescission were raised during the pendency of this litigation via motions for summary judgment and the responses thereto. Thus, both parties were provided the opportunity to argue the matter, and were afforded the chance to state how either remedy might result in prejudice to them. Neither Connor nor Meadow raised the issue of the statute of limitations. Indeed, the matter was not raised at any time prior to appeal. The running of a statute of limitations is an affirmative defense that must be asserted in the pleadings, or it is waived. Civ. R. 8(C); Mills v. WhitehouseTrucking Co. (1974), 40 Ohio St.2d 55; Haney v. Motorist Mut. Ins.Co., Tuscarawas App. No. 2002AP110093, 2003-Ohio-3412.
 {¶ 22} With regard to Pepperridge's claim that it is not subject to the 1991 Agreement because it did not execute any prior easement that could be modified by the 1991 Agreement, we conclude that this argument lacks merit. As stated in Part V, below, *Page 8 
with respect to the Fourth Assignment of Error, we conclude that the 1991 Agreement is valid regardless of the existence, or validity, of any underlying easement agreements.
 {¶ 23} The first assignment of error is overruled.
 III {¶ 24} The second assignment of error provides as follows:
 {¶ 25} "THE TRIAL COURT ERRED IN FINDING THAT R.C. § 5311.25 APPLIED ONLY TO CONDOMINIUM MANAGEMENT CONTRACTS AND THEREFORE DID NOT ACT AS A BAR TO PLAINTIFF'S CLAIMS AGAINST WELLINGTON GREEN CONDOMINIUMS, THE MEADOW AT WILDWOOD CONDOMINIUM, AND PEPPER RIDGE CONDOMINIUM."
 {¶ 26} In this assignment of error, Wellington and Pepperridge contend that they are not bound by the 1991 Agreement, and Meadow contends that it is not bound by the 1996 Agreement, because they were all "developer controlled" associations at the time they entered into their respective contracts. In support, they argue that R.C. 5311.25(D) provides that contracts executed by developers may be cancelled by the unit owners once they form an association.
 {¶ 27} The version of R.C. 5311.25, in effect at the time the 1991 and 1996 Agreements were executed, was titled "Certain Provisions Required in Condominium Instruments," and stated in pertinent part as follows:
 {¶ 28} "No developer or agent, directly or indirectly, shall sell or offer to sell a condominium ownership interest in a condominium development unless the condominium instruments pertaining to the development provide that:
 {¶ 29} "* * *
 {¶ 30} "(D) Neither the unit owners association nor the unit owners will be subject *Page 9 
to any management contract or agreement executed prior to the assumption of control required by division (C) of this section for more than one year subsequent to that assumption of control unless such a contract or agreement is renewed by a vote of the unit owners pursuant to the bylaws required by section 5311.08 of the Revised Code."
 {¶ 31} Connor argues that the clear language of the statute merely provides for the ability to cancel management contracts. Connor argues that the Agreements at issue do not involve management issues, and are therefore not subject to cancellation. Conversely, the Associations argue that the statutory language provides for the cancellation of any management contract as well as for the cancellation of any other type of agreement.
 {¶ 32} From our reading of the statute, it is not clear whether it is limited to management contracts and agreements or whether it applies to all types of contracts. And case law on this statute is sparse and also less than clear. The Associations contend that the Ohio Supreme Court has addressed the matter in Belvedere Condominium Unit Owners'Association v. R.E. Roark Companies, Inc., 67 Ohio St. 3d 274,1993-Ohio-119, wherein the court states:
 {¶ 33} "We believe, and the parties appear to agree, that this provision entitles the board of the owners' association, once fully elected by the individual unit owners, to cancel contracts entered into by the developer-controlled board. This provision protects owners from inequitable contracts and agreements * * *." Id. at 281.
 {¶ 34} The Associations argue that this statement inBelvedere demonstrates the Supreme Court's view that the prior version of R.C. 5311.25(D) provided for the ability to cancel all contracts entered into by developers, not merely those regarding management, *Page 10 
unless later ratified by the unit owners.[6] However, Connor argues that the above-quoted passage is merely dictum, because it has no bearing on the holding of the case, which is limited to whether a developer owes fiduciary duties to the unit owners. Connor cites the later case of Gillmor v. Delta Shores Dev. Co. (Oct. 31, 1997), Ottawa App. No. OT-97-009, which determined that the Belvedere holding is limited to management contracts and management agreements. Id. *4.
 {¶ 35} Our review of Belvedere confirms Connor's view of the above passage as dictum. The court's opinion was confined by its syllabus to the determination that a developer has no fiduciary duty to the owners' association, and that a developer is strictly liable for failure to make certain required disclosures. Id. Thus, we are left with theGillmor decision, which holds that the prior version of the statute is limited to contracts and agreements involving management issues, and does not affect contracts such as the 1996 and 1991 Agreements.
 {¶ 36} We conclude that this issue can be resolved regardless of how one interprets the type of contracts covered under the prior statute. The evidence shows that Wellington and Pepperridge abided by the terms of the 1991 Agreement for over ten years after its execution, while Meadow acted under the 1996 Agreement for at least six years. During that time, the unit residents used the facilities and the appropriate fees were paid. Although they engaged in talks regarding the renegotiation of some of the terms of the Agreements, none of these three Associations took any action to invalidate, rescind or cancel its respective contract or to give Wildwood Recreational any indication that the Agreements were not properly ratified. In sum, the Associations operated as though they had ratified the Agreements. The trial court noted that there was no *Page 11 
evidence to indicate that the Agreements were not ratified. Therefore, the trial court found that the Agreements had been "ratified or extended" by the course of conduct of the Associations. We agree. Thus, any claim that the contracts are invalidated by the statute are without merit.
 {¶ 37} Therefore, the second assignment of error is overruled.
 IV {¶ 38} The third assignment of error states as follows:
 {¶ 39} "THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO PLAINTIFF ON SECTION 4.1 OF EXHIBIT A (THE RIGHT OF FIRST REFUSAL)."
 {¶ 40} In their counterclaim, the Associations allege that the 1991 Agreement was breached by Connor because Wildwood Recreational failed to comply with a provision giving the Associations the right of first refusal in the event of a sale of the subject property. Specifically, the counterclaim alleges that on April 12, 2002, the Associations received notice of Wildwood Recreational's intent to sell the property for the price of $700,000 but that the property was "actually transferred to a different party and for no consideration." The counterclaim further alleges that the Associations were entitled "to take title to the property for no consideration."
 {¶ 41} Connor filed a motion for summary judgment on this issue, in which it argued that no breach occurred because the Associations were provided with appropriate notice of the sale and they did not exercise the right of first refusal. Connor further argued that any remedy for a breach of Section 4.1 would be against Wildwood Recreational rather than Connor. The Associations filed a motion seeking additional time to conduct discovery on the issue, but they never filed a response to the motion. Instead, the Associations filed a subsequent motion for summary judgment in which they argued *Page 12 
that Wildwood Recreational failed to provide all documents regarding the sale. Thereafter, the trial court rendered summary judgment in favor of Connor, based upon its finding that the Associations did not dispute receiving a notice of the offer to purchase as well as a copy of the purchase agreement, and that the Associations took no action to exercise their right of first refusal.
 {¶ 42} Section 4.1 of the 1991 Agreement provided the Associations with the right of first refusal in the event Wildwood decided to sell the recreation facility. Of relevance hereto, that section states as follows:
 {¶ 43} "If * * * [Wildwood Recreational receives an offer to purchase the facility, it] shall promptly transmit to the [Association] Members a written notice of such an offer, together with a full and complete copy of all documents relating thereto, including without limitation, a copy of the purchase offer executed by the [prospective purchaser]. * * * If no [Association] Member exercises this right of first refusal, [Wildwood Recreational] may then sell the real Property to such third party provided such sale is on the same terms and conditions and for the same price set forth in the notice of such offer sent to the [Association] Members, and is consummated within the time set forth in said third party offer. [Wildwood Recreational] shall send to the [Association] Members copies of all written communications to third parties regarding potential sales of the real Property."
 {¶ 44} The record demonstrates that Connor and Wildwood Recreational entered into a purchase agreement for the subject property on April 10, 2002. On April 12, Wildwood Recreational mailed a letter giving notice of the proposed sale to the Associations. The letter also noted that, pursuant to Section 4.1, the Associations had 30 days from receipt of the notice letter in which to give notice of their intent to exercise their right to purchase the property. The purchase agreement was amended on two occasions; however, neither amendment altered the purchase price or the property *Page 13 
involved. The purchase agreement was closed on July 31, 2002. At no time prior thereto did the Associations express an intent to exercise their right of first refusal.
 {¶ 45} We cannot say that the trial court erred by rendering summary judgment on this issue. While it does appear that Wildwood Recreational breached the terms of the Agreement by failing to provide all documents related to the sale, there is nothing in the record that would support a finding that the Associations were adversely affected, or damaged, by this breach. It is clear that the Associations were provided notice of the sale and of the purchase price, and were thus aware of the proposed sale and the proposed purchase price. It is further clear that the Associations did not take any action to exercise their right of first refusal. Finally, the property was conveyed for the price of $700,000, as set forth in the original notice sent to the Associations, thereby negating the claim that the Associations were entitled to purchase the property for "no consideration."
 {¶ 46} The third assignment of error is overruled.
 V {¶ 47} The fourth assignment of error is as follows:
 {¶ 48} "THE TRIAL COURT ERRED IN FINDING THE 1991 AGREEMENT (EXHIBIT 17) WAS A STAND ALONE AGREEMENT."
 {¶ 49} In this assignment of error, the Associations claim that the trial court erred in finding that the 1991 Agreement was valid and enforceable regardless of the status of the prior easements executed by the Associations. In support, they argue that "the plain language of the 1991 Agreement clearly shows that the parties did not intend it as a stand alone agreement[,]" and that the Agreement is not intended to "supercede [sic] the underlying Deeds of Easements as a stand alone agreement, but that they work together as an incorporated document." *Page 14 
 {¶ 50} At the outset, we note that regardless of whether the underlying easements are valid, we agree with the trial court's determination that the 1991 Agreement is a whole and complete contract binding all the parties thereto.
 {¶ 51} "In its most basic form, a contract is generally defined as `a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration'" Champion Gym Fitness, Inc. v. Crotty, Montgomery App. No. 22209, 2008-Ohio-5642, ¶ 11, quoting Minister Farmers Coop.Exchange Co., Inc. v. Meyer, 117 Ohio St.3d 459, 2008-Ohio-1259, at ¶ 28.
 {¶ 52} "A meeting of the minds as to the essential terms of the contract is a requirement for enforcing the contract." Id., citingEpiscopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations
(1991), 61 Ohio St.3d 366, 369. "`In order for a meeting of the minds to occur, both parties to an agreement must mutually assent to the substance of the exchange.'" Id., quoting Miller v. Lindsay-Green,Inc., Franklin App. No. 04AP-848, 2005-Ohio-6366, at ¶ 63. A meeting of the minds occurs if "a reasonable person would find that the parties manifested a present intention to be bound to an agreement." Zelina v.Hillyer, 165 Ohio App.3d 255, 2005-Ohio-5803, ¶ 12.
 {¶ 53} The 1991 Agreement sets forth the parties, the terms, and the consideration. In short, as previously stated, it permits the residents of the Association members to utilize the recreational facilities in exchange for a fee. The Agreement also imposes, upon Connor, the obligations of providing insurance and maintenance for the facilities. Although the Agreement states that it is intended to modify the prior easements executed by the Associations, it also specifically states that it is controlling with regard to any conflict between it and the easements. Simply put, regardless of whether it claims to *Page 15 
modify the underlying easements, this Agreement sets forth all terms, and contains all elements, necessary to create a valid, binding contract. Therefore, we cannot say that the trial court erred in determining that the 1991 Agreement is legal and binding in its own right and without regard to the validity of any prior easements.
 {¶ 54} The fourth assignment of error is overruled.
 VI {¶ 55} The fifth assignment of error states:
 {¶ 56} "THE TRIAL COURT ERRED WHEN IT HELD THAT TOWN PROPERTIES DID NOT INTERFERE WITH THE EASEMENT RIGHTS OF THE UNIT OWNERS."
 {¶ 57} The Associations contend that by maintaining offices, a pub, and a golf pro shop in the Manor House, Connor interfered with the rights of their members to the unfettered use of the recreational facilities. They further claim that such interference constituted a material breach of the Agreements, which relieved them of their financial obligations thereunder. They claim that the trial court's decision to the contrary is erroneous.
 {¶ 58} Under Ohio law, to prevail on the claim that Connor breached the contract prior to the termination of payments by the Associations, the Associations must prove that Wildwood Recreational and/or Connor failed to perform under the terms of the contract and that the non-performance resulted in damages to the Associations. O'Brien v. OhioState Univ., Franklin App. No. 06AP-946, 2007-Ohio-4833, ¶ 44.
 {¶ 59} However, "the doctrine of substantial performance provides that, where a contract requires numerous performances by one or more of its parties, a party's breach of a single term thereof does not discharge the nonbreaching party's obligations under the remainder of the contract unless performance of that single term is essential to the *Page 16 
purpose of the agreement." O'Brien, ¶ 46, citations omitted. "Stated another way, default by a party who has substantially performed does not relieve the other party from subsequent performance." Id. The Ohio Supreme Court has stated that "merely nominal, trifling or technical departures [from the contract terms] are not sufficient to breach the contract." Ohio Farmers' Ins. Co. v. Cochran (1922), 104 Ohio St. 427.
 {¶ 60} The record demonstrates that Wildwood Recreational, and subsequently Connor, utilized a portion of the Manor House for the above-cited purposes. Indeed, the record shows that Wildwood Recreational was doing so at the time the 1991 and 1996 Agreements were executed. Further, nothing in the Agreements prohibits these usages by Wildwood Recreational or Connor, and there is no provision requiring them to pay rent for these usages. It is clear that the Association members get some benefit from having the golf pro shop and the pub available to them as part of the recreational facilities. Thus, the only portion of the Manor House to which the residents lack access is the part being used as offices for Connor. From the deposition evidence in the record, we conclude that Connor's use of some space for its offices was deemed inconsequential by the Association members. It is to be expected that a provider of on-site recreational services would require some space for an on-site office in order to perform its duties under the contract.
 {¶ 61} We agree with the trial court's determination that the use of a portion of the Manor House does not constitute a breach of either the 1991 or 1996 Agreements. Even if it were deemed to be a breach, we cannot say that it would amount to a material breach sufficient to excuse the Associations from performing their obligations under the Agreements. The remainder of the Manor house is, as required by Agreements, available for use by the residents. The portions used for the golf pro shop and the pub are also open for the residents' use. *Page 17 
 {¶ 62} The fifth assignment of error is overruled.
 VII {¶ 63} The sixth assignment of error provides:
 {¶ 64} "THE TRIAL COURT ERRED IN ITS FINDING THAT THE CONDOMINIUM ASSOCIATIONS WERE THE PARTIES IN THE UNDERLYING DEEDS OF EASEMENT."
 {¶ 65} The Associations contend that they were not the parties to the original easements, and that the trial court erred by determining otherwise. They further contend that as nonprofit corporations, they cannot hold property rights. They contend that the individual unit owners retain all property rights. In consequence, they argue that they, as homeowners' associations, lacked the ability to enter into the 1991 Agreement, which was a modification of the prior easements, which they claim were executed by the unit owners.
 {¶ 66} Again, as stated above, we conclude that the 1991 Agreement was a separate, valid, enforceable contract regardless of the nature of any prior easement. Therefore, we conclude that the Associations were capable of entering into the contract regardless of who executed the prior easements.
 {¶ 67} Furthermore, we do not conclude that the 1991 Agreement constitutes an easement conveying property rights. It appears to us that the 1991 Agreement provides a license to the members of the Associations for the use of recreational facilities. A license is a privilege given to an individual to do an act upon the land of another without possessing any interest therein, and is usually terminable at the will of the licensor. Mosher v. Cook (1980), 62 Ohio St.2d 316, 317. Unlike an easement, a license is "`a personal, revocable, and nonassignable privilege, conferred either by writing or parol, to do one or more acts upon land without possessing any interests in the land.'" DePugh v. *Page 18 Mead Corp. (1992), 79 Ohio App.3d 503, 511. "There are two types of licenses: a revocable license which is a privilege to do an act upon another's land and an irrevocable license or a license coupled with an interest." Turner v. Burgandy Bay, Ottawa App. No. OT-08-010,2008-Ohio-3846, ¶ 18, citation omitted. "If the parties to the agreement intend the license to be permanent in nature it is said to be coupled with an interest." Id., citation omitted.
 {¶ 68} In this case, the Agreement is not, by its language, intended to be permanent. By its terms, it runs for a period of ten years. While the Agreement will automatically renew for successive ten-year periods, it will not do so if terminated by the parties. Pursuant to the Agreement, the resident members of the Associations are granted the privilege of utilizing the Manor House and Lodge facilities, as well as the swimming pool and tennis courts in exchange for a fee. Nowhere does the Agreement purport to grant the Associations an interest in the property. Should the Associations fail to pay the requisite fee, the privilege of utilizing the recreational facilities can be suspended by Connor.
 {¶ 69} Based upon the terms of the Agreement, we conclude that it appears to constitute a license rather than an easement. Thus, we conclude that it does not vest the Associations with any property rights.
 {¶ 70} Accordingly, the sixth assignment of error is overruled.
 VIII {¶ 71} The seventh assignment of error is as follows:
 {¶ 72} "THE TRIAL COURT ERRED IN HOLDING THE 1991 AGREEMENT WAS A FIXED FEE CONTRACT AND NOT A COST SHARING ARRANGEMENT." *Page 19 
 {¶ 73} The Associations contend that Connor breached the terms of the 1991 Agreement by improperly using a portion of the fees it collected from them for payment of expenses, such as mortgage payments. This argument is based upon the claim that the Agreement provided for a cost-sharing arrangement that limited the use of the fees to items related to the "maintenance, management and operation of the recreation facilities." Thus, the Associations contend that the trial court erred when it concluded that the Agreement provided for a fixed-fee rather than for a cost-sharing arrangement.
 {¶ 74} In its decision, the trial court found that the Agreement provides for a fixed fee to be paid by the Associations, and that it does not place a limitation on Connor's use of the fees. Specifically, the trial court stated that "the fee is not set at a pro rata share of costs, does not move up and down with costs, and does not require that budgets be shared. Instead, it is set at a particular amount, and can be increased at the rate of three percent per year." Therefore, the trial court found that Connor did not breach the Agreement in this regard.
 {¶ 75} From our review of the Agreement, we conclude that the trial court did not err. The word "fixed" indicates something that is not subject to fluctuation. Webster's Ninth New Collegiate Dictionary (1988) 468. The Agreement provides for a fee that was fixed at the inception of the Agreement at the amount of fifteen dollars per month. This amount cannot be changed more than yearly, and any increase is limited to no more than three per cent of the prior year's fee. We find no language within the Agreement purporting to limit Connor with regard to the manner in which it uses the fees received, nor can we find any language indicating that the Associations are merely required to pay a sum representing their share of the costs of operating and maintaining the facilities. To the contrary, the Agreement clearly provides that the Associations shall pay a fee, in *Page 20 
exchange for which their members are entitled to use the recreational facilities.
 {¶ 76} The seventh assignment of error is overruled.
 IX {¶ 77} The eighth assignment of error states:
 {¶ 78} "THE TRIAL COURT ERRED IN HOLDING THAT THE ARBITRATION PROVISION BARRED THE DEFENDANTS' DEFENSE OF BREACH OF CONTRACT FOR FAILURE TO MAINTAIN THE RECREATIONAL FACILITIES."
 {¶ 79} In this assignment of error, the Associations contend that the trial court erred when it concluded that an arbitration provision in the 1991 Agreement barred them from asserting a prior breach of the Agreement by Connor as a defense to Connor's claims in this lawsuit.
 {¶ 80} Of relevance to this issue, the 1991 Agreement contains the following provisions:
 {¶ 81} "Section 1.2. [Connor] shall assure that the Recreational Facilities are maintained in manner consistent with other first class recreational areas located in housing subdivisions in the Cincinnati Metropolitan area.
 {¶ 82} "Section 3.6. * * * If a dispute arises over whether the Recreational Facilities are maintained in accordance with Section 1.22, [the parties] shall appoint a third party to resolve the dispute within thirty (30) days after the request of either party. If the parties cannot agree on a third party within the thirty (30) days then either party may refer the dispute to the American Arbitration Association (AAA). The determination of the third party shall be binding upon the [parties]. If the third party determines that [Connor] has not performed its maintenance obligations as required by Section 1.2, the [Association] *Page 21 
Members who wish to do so may, at their option, perform the required maintenance and withhold payment of [fees] in an amount and for a period of time sufficient to cover the expenditure made by such [Association] Members."
 {¶ 83} The Associations raised Connor's alleged failure to properly maintain the recreational facilities as a defense to Connor's claim for monetary damages. In other words, the Associations contended that Connor is not entitled to its claimed damages, because Connor breached the terms of the Agreement, thereby permitting the Associations to terminate payment under the Agreement.
 {¶ 84} From our review of the record, we do not conclude that the trial court interpreted this arbitration clause to bar any defense raised by the Associations. The trial court merely noted that Section 3.6 provides a self-help remedy to the Association members, which, by its terms, negates the Associations' claim that any failure to maintain the facilities is a material breach of the Agreement permitting termination thereof. Furthermore, the trial court considered testimony regarding whether the facilities were properly maintained, and whether the lack of maintenance permitted the Associations to withhold payment of the fees required under the Agreement. After hearing the evidence, the trial court found that the facilities' maintenance, or lack thereof, did not raise any issue of material breach. Therefore, even had the trial court incorrectly construed the subject provision, any error was harmless, since the trial court went on to determine the merits of the issue as raised by the Associations.
 {¶ 85} The eighth assignment of error is overruled.
 X {¶ 86} The ninth assignment of error is as follows: *Page 22 
 {¶ 87} "THE TRIAL COURT ERRED IN ORDERING INJUNCTIVE RELIEF FOR FUTURE ASSESSMENTS."
 {¶ 88} The Associations contend that the trial court erred by including the following in its judgment:
 {¶ 89} "The Court finds that [Connor] is entitled to specific performance of the 1991 Agreement and the 1996 Easement Agreement since they are unique agreements and damages for non-performance would not adequately compensate the Plaintiff for a breach by any Defendant.
 {¶ 90} "The Court finds that [Connor] is entitled to injunctive relief enjoining each Defendant from refusing to pay future assessments as they become due under the terms of the 1991 Agreement and the 1996 Agreement unless the Agreements are amended or terminated according to the terms of the Agreement."
 {¶ 91} "Generally, injunctive relief is not granted where there is an adequate remedy at law." Smith v. Advantis Computer Consulting,Inc. (Mar. 29, 2001), Franklin App. No. 00AP-361. "Granting injunctive relief requires a showing of irreparable harm to the party seeking injunctive relief. Irreparable harm is defined as harm that cannot be measured in money damages." Id., citing Levine v. Beckman (1988),48 Ohio App.3d 24, 27.
 {¶ 92} The Associations argue that damages in this case can be measured in monetary terms, thereby rendering equitable relief inappropriate. Connor cites Outback/Buckeye II Ltd. v. Lofino, Greene App. Nos. 06-CA-2, 06-CA-44, 2007-Ohio-577, for the converse proposition that "prospective orders for specific performance of money payment obligations (such as in compelled real estate purchases) are often implemented by an injunction where the subject matter is unique." Id. at ¶ 19. Connor contends that *Page 23 
this is the unique case in which "damages for non-performance [of the subject Agreements] would not adequately compensate for any breach by [the Associations]."
 {¶ 93} We find the Lofino case to be distinguishable. Lofino dealt with restaurants whose success, or lack thereof, were highly dependent upon their location. Id. In Lofino, the court of appeals, in ruling that the imposition of an equitable remedy was appropriate, stated as follows:
 {¶ 94} "`Specific performance is an appropriate equitable remedy for the breach of a commercial lease, even without further evidence that there is no adequate remedy at law' * * * [because] the `effect of location on retail trade is notoriously difficult to project. That is consistent with the legal principle that an interest in land is unique; different locations are not interchangeable.'" Id. at ¶ 64, quotingSholiton Industries, Inc. v. Wright State Univ. (Sep. 20, 1996), Greene App. No. 95-CA-101.
 {¶ 95} In this case, we are dealing with an established recreational facility, and the failure to make monthly payments for access to those facilities. As seen by the fact that the trial court was able to calculate the amount of monies owed as well as prejudgment and post-judgment interest thereon, we conclude that any damages for a possible future breach of the contract will be capable of being reduced to a money judgment.
 {¶ 96} Accordingly, the ninth assignment of error is sustained.
 XI {¶ 97} The tenth assignment of error states as follows:
 {¶ 98} "THE TRIAL COURT ERRED WHEN ON ITS OWN MOTION IT DECONSOLIDATED THE CASE TO REMOVE THE JURY DEMAND." *Page 24 
 {¶ 99} The Associations contend that the trial court erred when "right before the trial of this matter the Court on its own, vacated the October 5, 2006 order consolidating this case with another filed by [the Associations] in this case along with a jury. The Court did this for the stated purpose of eliminating the jury demand." The Associations claim that this action prejudiced their case. Connor contends that the Associations waived this argument by failing to raise an objection to this order at any time during the two months following the issuance of the order and the beginning of the trial. The Associations counter with the argument that there is no requirement that they preserve, by objection, the right to appeal an order issued by the trial court sua sponte. The Associations have failed to set forth any case or statutory law in support of this claim.
 {¶ 100} A review of the record shows that in October 2006, the trial court, sua sponte, consolidated this case with a later-filed case. However, in January 2007, the trial court, again acting sua sponte, issued an order that cases be "de-consolidated." In issuing this order, the trial court stated that "it now appears to the Court that these matters should not have been consolidated since the theories of recovery are totally different, in case number CV06-04-1367 the parties have asked for a jury determination whereas in [this action] no jury demand has been filed; and the severance will simplify the issues in both cases."
 {¶ 101} Civ. R. 42(A) provides a trial court with the discretion to consolidate cases for trial. The rule also vests the trial court with discretion to order separate trials of any "claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, or third-party claims, or issues, always preserving inviolate the right to trial by jury." Civ. R. 42(B). Thus, unless a trial court abuses its discretion in this regard, its order will not be reversed. An abuse of discretion *Page 25 
occurs when the order of the trial court is unreasonable, arbitrary or unconscionable. Martin v. Martin, Clark App. No. 08CA0014,2008-Ohio-6336, ¶ 24.
 {¶ 102} We cannot find, and the Associations fail to cite, any support for their contention that they need not raise any objection in order to preserve this issue for appeal. Thus, we conclude that they have waived appellate review of this issue. Moreover, Civ. R. 42 vests the trial court with the authority to order separate trials of claims or issues so long as it does not deprive a litigant of the right to jury trial. No jury demand was made in this case. Thus, the Associations have not shown prejudice.
 {¶ 103} Therefore, the tenth assignment of error is overruled.
 XII {¶ 104} The ninth assignment of error having been sustained, that portion of the trial court's judgment requiring future specific performance by the Associations is Reversed and Vacated. All other assignments of error having been overruled, the judgment of the trial court is Affirmed in all other respects.
BROGAN and GRADY, JJ., concur.
Hon. James A. Brogan, Hon. Mike Fain, and Hon. Thomas J. Grady, judges of the Second District Court of Appeals, sitting by assignment of the Chief Justice of Ohio, pursuant to Section 5(A)(3), Article IV, of the Ohio Constitution.
[1] Except when referring to a single association, we will refer to the six condominium associations involved in this appeal collectively as "the Associations."
[2] Pepperridge did not execute any Easement Agreement. Meadow did not execute an Easement Agreement until its formation in 1996.
[3] Pepperridge was a party to the 1991 Agreement. However, Meadow was not, since it had yet to be formed.
[4] Applewood is not a party to this appeal. The Bluffs and Connor reached a settlement agreement in December, 2008.
[5] It appears that Towne owned at least three subsidiaries with the name "Wildwood" in their titles.
[6] Belvedere involved a lease that was executed by the developer. Id. at 276. *Page 1